THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOHNNIE. L. ELLIS, Defendant-Appellant.

(No. 73-292;

Third District—December 30, 1974.

Braud, Warner & Neppl, of Rock Island (Marvin W. Gray, of counsel), for appellant.

David DeDoncker, State's Attorney, of Rock Island (F. Stewart Merdian, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE DIXON delivered the opinion of the court:

After a jury trial the defendant was found guilty of armed robbery and sentenced by the Circuit Court of Rock Island County to a term of not less than 4 nor more than 5 years. He appeals contending (1) that the identification procedures denied him a fair trial and (2) that the State failed to prove him guilty beyond a reasonable doubt.

On February 3, 1973, at about 7 A.M., Randy Carnithan, a 17-year-old high-school senior, who was working alone as an attendant on the 12-midnight-until-8-in-the-morning shift at the Clark gasoline service station located on 7th Avenue between 26th and 27th Streets, in the city of Rock Island, Rock Island County, Illinois, was robbed of approximately $40 which he had in his front pocket, and, in addition, about seven rolls of pennies and some loose quarters, dimes, and nickels were taken from a desk drawer.

At the time of trial, Randy Carnithan testified, describing the robber

as being a black person, a little shorter than he, and heavier than he, wearing a light overcoat and a purple-colored shirt and colored designs in his pants; that the pants were different colors. The robber's hair was neat, and he had something in his mouth like cotton or a handkerchief stuck up under his lip. The robber was armed with a black revolver, with a barrel 2 or 3 inches long. The man said, "Get in the back room", asked for the money, and upon being given $40 asked if there was anything more, and was told there wasn't. He then told Randy Carnithan to lay down on the floor, which Randy did. The robber then put the money in a brown paper bag, like a lunch bag, which he had in his pocket, closed the door between the front and back room of the service station, and left. When Randy Carnithan heard the front door close, he opened the inner door, ran to the door, looked out and saw the robber running away to the east and behind the gas station. Randy Carnithan then called the police. He saw the robber, whom he identified at trial as the defendant, in the back of the police car about 15 or 30 minutes later and identified the defendant right away as being the robber, without the police asking him anything.

Randy Carnithan testified that the robber did not have a moustache; that at the time the trial was held, the defendant looked the same except for his moustache and clothes.

Randy Carnithan further testified that, when he had called the police station to report the robbery, he said that the robber was black; about 6 feet tall, weighing about 160-165 lbs., had on a long white coat, purple-color shirt and print colored pants. On cross-examination, Randy Carnithan stated that the robber seemed to weigh 160 to 165, could not have been 260 or 200 or 225 lbs; that he had neat, short hair; that Randy Carnithan had no trouble seeing the moustache of defendant as shown by a picture taken of the defendant on February 6, 1973.

When Randy Carnithan first identified the defendant as the robber, when the defendant sat in the back seat of the police squad car, he was 6 feet away from him and 3 feet away from the automobile. The defendant at that time did not have cotton in his mouth.

The denomination of the money taken, as testified to by Randy Carnithan, was: quite a few ones; two or three fives, one or two tens, and about seven rolls of pennies.

Freeman Hunter, a butcher employed at the A & P, was waiting in his car in the parking lot of A & P to go to work at 7 A.M. on February 3, 1973. His car was parked facing north. While he sat there, a car went past on his left side, through the parking lot, toward the town of Rock Island, at about 40 to 45 miles per hour. The car had a black top and was goldish, with a dent in the front right fender on the passenger

side. It did not stop at the driveway before proceeding out on the street. The car went west from the east. Mr. Hunter did not see the occupants. When he was later shown a car by the police officer, he told him that he was not sure whether or not that was the car. He doesn't know whether he is color blind or not. He is a little bit nearsighted.

Kathryn Wise, the Rock Island police clerk, testified that she took the original complaint over the phone on an IBM card; that the robber's plaid pants were shown on the card in parentheses as being yellow, black, tan, but that is a mistake; that those colors refer to the color of the car. She later that same day typed up the information from the original card on a card, People's exhibit 5, but does not know how long the original cards are kept; that she did not realize that "yellow, black or brown" was the wrong color for the pants, until after it was called to her attention by Detective Coleman before a hearing held in the latter part of May.

Larry Requet, a Rock Island police officer, testified that he was alone in a squad car on February 3, 1973, at approximately 30th Street and 14th Avenue, in Rock Island, when he received a message over the radio that there had been an armed robbery at the Clark service station at 7th Avenue and 27th Street; that he was told to look for a gold-color car with a dent in the fender; that the description of the robber, which he had, was a male Negro, wearing a brown coat, purple shirt and plaid pants. Officer Requet saw a car of that description driven by a person matching this description at 9th Street and 6th Avenue in the city of Rock Island. There were two Negroes in the car. He followed the car, and pulled alongside it at a stoplight to observe the dent in the right side fender. The car he was following, then went to 910 14th Avenue. The driver got out and went in the house for about 30 seconds, and Officer Requet, who had parked his squad car on 14th Avenue, west of 9th Street, went past the car to 10th Street and 14th Avenue, and stopped and waited until the driver came out of the house and got in the car and drove east on 14th Avenue to 10th Street, made a left on 10th Street in front of the squad car, and the squad car followed it. The car headed west on 13th Avenue toward 9th Street, and made a right-hand turn on 9th Street and 13th Avenue, going through a stop sign. Officer Requet followed the car from there to 9th Street and 3rd Avenue, where the car turned east to go to 11th Street and pulled over. Officer Requet testified that he pulled his squad car in behind the car he had been following, and placed the driver under arrest for running a stop sign. Two other squad cars also pulled up there, one driven by Sergeant Ferguson and the other by Hartman. Sergeant Ferguson then got into the squad car with the defendant, Johnnie L. Ellis, and Officer Requet,

and they headed east down 3rd Avenue. Sergeant Ferguson advised the defendant orally of his *Miranda* rights. They then headed for Clark service station, and as they pulled up, the attendant ran out to the car and yelled, "They got him." Officer Requet testified that the attendant, he believes, was yelling to someone else, another attendant. At this point, Sergeant Ferguson, Officer Requet testified, placed the man under arrest for armed robbery. Then Officer Requet testified that he got out of the car and asked the fellow to be positive. He looked in and said, "Yes, this is the man." The defendant was then taken to the police station and booked. People's exhibits 2, 3 and 4 are the clothes taken from the defendant.

On cross-examination, Officer Requet testified that at 7th Avenue and 9th Street he was sure he had the right car, but he was not sure he had the right person until the person got out of the car at 14th Avenue and he saw his clothes. At an earlier hearing, Officer Requet said he didn't make the arrest at that time because he was alone. When Mr. Ellis pulled up in front of the house on 14th Avenue and got out of his car and went into the house, Officer Requet parked his squad car on the same street to watch him, and another squad car, his backup car, pulled up behind Officer Requet. Before Mr. Ellis came out of the house, there were two policemen there, two squad cars. Officer Requet testified that in his squad car, he then followed Mr. Ellis from 9th Street and 13th Avenue to 3rd Avenue and 11th Street, where Mr. Ellis stopped and got out of his car, before Officer Requet arrested him for passing a stop sign at 9th Street and 13th Avenue. The defendant was wearing a hat when he was arrested. Officer Requet testified that he did not see defendant carry anything into the house at 910 14th Avenue.

There is no testimony that any search was ever made of the house into which defendant went, for any evidence from the robbery. At the time of defendant's arrest, he was driving the car and accompanied by another black person. The other person was not placed under arrest. He was left there. Officer Requet testified that Mr. Ellis was taken over to the gas station to see if the victim could identify him. Mr. Ellis was not put in a lineup before he was taken over for Randy Carnithan to see him. Officer Requet testified that he does not know if there were any fingerprints taken from the cash drawer or any other part of the gas station. There were no other black persons in the squad car other than Mr. Ellis at the time that Mr. Carnithan said "They got him." He doesn't know if Mr. Ellis was wearing a hat at the time the police pulled in in the squad car. Sergeant Ferguson was in the back seat with Mr. Ellis. Mr. Boyd, who was with the defendant at the time of defendant's arrest, did not fit any description that Officer Request had received concerning

this armed robbery. Officer Requet testified that the reason he did not make an arrest before he did was that he was waiting instructions from his Sergeant, Ferguson, who was behind him. He was in radio contact with him.

On redirect examination, Officer Requet testified that he was not afraid when he was alone at the time he saw the defendant leave the car and enter the residence, but he didn't want to get hurt, and he wasn't sure if he had anybody close enough that could back him up.

James A. Ferguson testified that he is a sergeant on the Rock Island police force; that on February 3, 1973, at approximately 7:12 A.M. he was in the radio room at the police station when the call came in and he related some of the information to the cars on the street; that he then got in his squad car and proceeded to 17th Street and 6th Avenue, making a general check of the area. He met Officer Requet at 9th Street and 7th Avenue. As Officer Requet went south on 9th Street, he went north on 9th Street. After Officer Requet radioed, he proceeded to 9th Street and 12th Avenue, on a parallel course. He drove to 10th Street and 14th Avenue where Officer Requet was stopped. Sergeant Ferguson testified he saw a black-vinyl-top and gold-bottom Chevrolet parked in front of 910 14th Avenue. He radioed Officer Swank, who was still at A & P, and asked for a complete description of the car, and asked if he could identify the car. Officer Swank started to give it to him. At this time a subject entered the car and started the vehicle up and drove away. Sergeant Ferguson was about one-half a city block away when this happened. Officer Requet was directly in front of him. Sergeant Ferguson cannot describe the individual he saw. The individual drove away, making a left-hand turn on 10th Street, and headed north on 10th Street from 14th to 13th Avenue. Sergeant Ferguson was stopped and wrote down the information that Officer Swank was conveying to him by radio. After Officer Swank related the information, Sergeant Ferguson felt that it was possible it was the suspect in question. When Officer Requet radioed that he was going to make a traffic stop on the car, Sergeant Ferguson was still parked at 10th Street and 14th Avenue. Sergeant Ferguson saw Officer Requet follow the car, but he didn't follow Officer Requet. Sergeant Ferguson then proceeded to the location where Officer Requet said he was stopped, which was 11th Street and 3rd Avenue. Officer Requet had the car stopped and had two suspects out of the car. Sergeant Ferguson got out of the car and assisted Officer Requet. Sergeant Ferguson asked the passenger of the vehicle for identification. He identified himself as Wayne Boyd. Sergeant Ferguson does not recall having any conversation with the driver of the vehicle. At this time, Sergeant Ferguson believes that Officer Requet issued a traffic ticket to Johnnie

Ellis. Then Officer Requet and he discussed the information that they had on the armed robbery, and they felt that it was very possible that Mr. Ellis fit the description of the subject, and he was placed in a squad car and driven to the Clark station. On route to the Clark station, Mr. Ellis wanted to know what was going on, and Sergeant Ferguson told him that they had just had an armed robbery at the Clark station on 27th Street and 7th Avenue, advised him of his rights verbally, and told him that anything he said could be used against him, that he had the right to remain silent, and that, upon being questioned, he had the right to have an attorney. They arrived at the Clark station, and as they pulled into the driveway, Randy Carnithan, the complainant, was standing in the driveway, and he pointed a finger at the squad car and said, "That's him; that's him."

On cross-examination, Sergeant Ferguson testified that he did not instruct Officer Requet to stop Mr. Ellis; that Officer Requet did it entirely on his own; that Officer Requet had stopped Mr. Ellis and Mr. Boyd, and had them out of the car when he got there. Sergeant Ferguson testified: "It is not on my report that the ticket was issued. I do not have a right sheet with me. I did use one when I gave Mr. Ellis his rights. I did not give him all his rights. I advised him of his right to remain silent; that he had the right to have an attorney present during the questioning, and any statements that he made could be used against him. Mr. Ellis had the right to have an attorney present during lineups. He has the right to have an attorney. If he cannot afford one, one will be appointed by the court. I did not advise Mr. Ellis that he was a suspect in an armed robbery, and I was going to place him in a lineup, and he could call his lawyer." Sergeant Ferguson testified that he knows what a lineup is; that he did not conduct a search of Mr. Ellis prior to the time he placed him in the squad car that took him over to the station; that he does not know if he was searched, but doesn't believe so; that he rode in the back seat with Mr. Ellis, a man that he thought committed an armed robbery. However, he believed that Officer Requet searched him. Officer Requet was driving the car, and Sergeant Ferguson was sitting in the back seat alone with Mr. Ellis. Sergeant Ferguson testified that he kept defendant in his custody until he took him to the police station; that he searched him again and removed all of his personal belongings. Sergeant Ferguson testified that he did not find a gun and did not find a roll of pennies, and did not find any money that matched the denominations of the currency that the person said was missing; that he never made an investigation to find any fingerprints, and knows no one in his department who found any evidence whatsoever that connected Mr. Ellis with this offense other than Mr. Carnithan's statement. Ferguson testified: "I did not and I know of

no one else who searched the house that Mr. Ellis went into. I did not talk to the person there. I don't know whether Mr. Ellis left the gun or the money there. I don't know anything except that one man said this man committed an armed robbery. He brought him down for identification."

John Ellis testified that he is 23, and on February 3, 1973, was arrested at 3rd Avenue and 11th Street; that at the time he was arrested he did not have a gun in his possession or any rolls of pennies. That he had his wallet and keys and $48, consisting of four tens and a five and three ones; that he did not have upwards of 12 to 17 or 18 one-dollar bills in his possession. Johnnie Ellis testified that he saw a police officer following him that morning; that he spotted the officer at 4th Avenue and 9th Street in Rock Island, when he was traveling south on 9th Street; that he continued down 9th Street, and that the police car was about one car length away, immediately behind him; that he did not get out of the car at any time prior to his arrest, except at 14th Avenue and 9th Street. Johnnie Ellis testified that the windows of his car were up and he did not throw anything out of the car; that he remained at the house on 14th Avenue less than a minute; that he did not take anything with him and did not bring anything out with him; that he saw the police cars when he came out; that they were on both corners of 14th Avenue. Johnnie Ellis got back in his car and continued down 14th Avenue and made a left at 10th Street and another left at 13th Avenue and stopped at the stop sign and made a right and continued back down 9th Street. Defendant testified that he is sure he stopped at the stop sign at 13th Avenue and 9th Street because he had noticed them following him from 4th Avenue, and he got a little nervous; that he was wondering why they were following him, and he was being very cautious. After he stopped at the stop sign, he made a right down 9th Street. The police car followed him, and he did not speed or do anything else to give the police an excuse to stop him. His friend, Wayne Boyd, who was in the car with him, lives at the apartment building on 3rd Avenue and 11th Street, where he stopped. Defendant testified that he first saw Wayne Boyd about 5 minutes to 7 that morning at his apartment; that he went to his apartment, went inside and left with him about 20 minutes after 7, and went to 14th Avenue and 9th Street. Defendant testified that to his knowledge Wayne Boyd did not have a gun, coins, or any other items that might be connected to this armed robbery in his possession at any time. Wayne Boyd's girl friend was at his house. Defendant testified that he has not seen the traffic ticket he was given for running a stop sign at 13th Avenue and 9th Street; that he was never handed one, and has never received it; that he has no felony record.

On cross-examination, defendant testified that he arrived at Wayne Boyd's apartment 7 o'clock; that Wayne Boyd's girl friend's name is Diane Teague. Defendant testified that he drove a '72 Monte Carlo, black-vinyl-top, burnt-orange automobile; that he had on a purple shirt, blue-and-white slacks, a brown single-breasted cashmere coat, buckled dark-brown Hush Puppies, and a dark-brown suede hat; that he remained at the apartment of Wayne Boyd about 20 to 23 minutes; that he had $48 and some change with him; and that, at the time, he was unemployed. Defendant also testified that he worked part-time with his father, the last time being the week prior to February 3, 1973. The apartment where he stayed with Johnnie Jenkins from time to time is in her name and she pays the rent. There was a dent on the right fender and on the left rear of his car. Defendant testified: "Dean Johnson lived at the address where I went to on 14th Avenue and 9th Street. I saw a police officer's car following me while I was on the way to this house. There was one officer in the car. I was in the residence less than a minute. I was looking for Miss Dean Johnson's ex-husband. When I came out I saw two police cars there. When I drove away, both cars followed me. I came out and continued down 14th Avenue and made a left at 10th Street and made another left at 13th Avenue and stopped at the stop sign and made a right and went back down 9th Street. I was arrested for the stop-sign violation at 3rd Avenue and 11th Street. I stopped at 3rd Avenue and 11th at Wayne's apartment. I got out of the car. I did not get out of the car because the officer told me to. I just got out. I had a conversation with the officer at this time. As me and Wayne was getting ready to go into the apartment building, he called me over to the car. He asked me did I see that stop sign back at 13th Avenue. I said, 'Yes. I stopped for it.' He said, 'No, I didn't.' He said I ran it, and I told him he was mistaken. He told me to get into the car. I got in the car, and he said he was going to write me a ticket. I got a little upset about it. I told him I didn't run a stop sign, nor was I speeding. They didn't accuse me of speeding. I did not use profanity. I was put in the car, and another police officer came and sat in the back with me, and I asked him what was wrong, and he asked where I came from, and I told him, 'Right here, from Wayne's house.' He asked me if I had been up to the Clark station by A & P, and I told him, 'No,' and that's it. He didn't say anything else to me. He advised me of my rights after we went down to the service station. I was not given my rights on the way to the service station. They may have said it, but I was too busy asking what was wrong. But I do remember it was at the Clark station they give me my rights. When I arrived at the Clark station, I was seated in the back seat of the car. Sergeant Ferguson was back there with me.

Officer Requet drove the car. When I arrived at the service station, Officer Requet drove in and this guy, Mr. Carnithan, said 'That's him.' I got upset, and I said 'What is he talking about?' They said something about armed robbery. I said, 'No, he is mistaken.' I asked Mr. Carnithan, I said, 'Take a good look at me; you gotta be wrong.' He said, 'No.' He was telling Officer Requet, he said, 'That's him.' I asked Sergeant Ferguson if I could get out of the car so he could look at me. He was about 10 feet away when he said, 'That's him.' He bent down and looked through the car. I was sitting between the officer and Mr. Carnithan. He said, 'That's him' as soon as we drove up. I don't remember the officer asking Mr. Carnithan if he were sure. I am 5 feet 10. I weigh 220. They told me I was under arrest for armed robbery at both the Clark station as we were driving off and the police station. I have not talked with anyone concerning what happened except Mr. Braud. I have not talked with Johnnie Jenkins about it, nor Wayne Boyd. My appearance has not changed since the incident took place until today. I am still in the same physical condition, height, weight, everything."

On redirect examination, defendant testified that he did not speak with Mr. Boyd about it because Mr. Braud instructed him not to. The money Mr. Ellis had with him was his money.

Diane Richardson testified on direct examination that she lives at 1028 3rd Avenue, knows Wayne Boyd; that he is her boyfriend and lives with her at the address she gave. On February 3, 1973, John Ellis came to her house about 7 o'clock. He was alone. He stayed until about 7:30. Wayne Bold was there. She was interviewed by the police shortly after this happened, when John Ellis was in jail. She told the police then more or less what she testified to at trial, that she had no opportunity to speak to John Ellis, nor to Braud, defendant's attorney; that she had not spoken to anyone else prior to the time she spoke to the police about this.

On cross-examination, Diane Richardson testified that she has been known as Diane Teague; that defendant and Wayne Boyd left the apartment about 7:30. Defendant got to her apartment when she was asleep. When he knocked at the door, she glanced at the clock, and it looked like it was 7 o'clock. She stayed in bed in the bedroom, and they talked in the kitchen. The door between the bedroom and kitchen was open, but there are curtains over the door. She remembers looking at the clock when Mr. Ellis left, but she doesn't know why.

Johnnie B. Jenkins testified that on February 3, 1973, in the early morning hours, she saw Johnnie Ellis at five minutes before 7 a.m.

On cross-examination, Johnnie Jenkins testified that defendant had been at her house all night. She particularly remembers his leaving be-

cause she really didn't want him to go. He said he would be right back, and she made a point of looking at the clock. Mr. Ellis said he was going to Wayne Boyd's house. She supposed he could have gone someplace else. She owns a gold automobile which has a black-vinyl top and gold bottom. At that time it had a dent in the right front fender.

In rebuttal, Katie Wise testified that she participated on February 3, 1973, in a booking procedure of defendant. After refreshing her recollection from People's exhibit No. 6, she recalled the height given to her by the defendant was 5 feet 11 inches, the weight, 185, and his occupation: unemployed; and the amount of cash he had on his person: $45, and she does not remember what amount of change.

On cross-examination, Katie Wise testified that when she is on duty she books all the people, five days a week. She is confident that she transferred the information correctly from what it was originally written on to the typed card. Nobody weighed Mr. Ellis at that time. There are no scales or height markers at the booking window. She does not remember, and the booking records do not indicate, the denomination of the bills taken from Mr. Ellis. She remembers unusual things, such as someone having a couple hundred dollars. This amount is not unusual. If Mr. Ellis' $45 was in the form of 17 one-dollar bills or 16 one-dollar bills and rolls of pennies, she would not have remembered the one-dollar bills, but you don't often have rolls of pennies in people's pockets. She does not recall anything as to the denomination in any way, shape, or form.

Vince Perez, a deputy sheriff, testified on surrebuttal in behalf of defendant that he had weighed John Ellis over at the county jail approximately 10 minutes before trial, and Mr. Ellis' weight was 202 pounds, on the scales used for the county's official weighing records.

On cross-examination, Mr. Perez testified that he had no knowledge at all of what the defendant may have told the Rock Island police when he was booked back in February.

■■ Defendant contends that his being returned to the scene of the robbery resulted in a denial of due process and relies primarily on *Stovall v. Denno*, 388 U.S. 293, and *People v. Blumenshine*, 42 Ill.2d 508. Single-suspect identifications are subject to constitutional analysis insofar as they are characterized by impermissible suggestiveness in violation of the due process clause of the Fourteenth Amendment. The test of *Stovall* is whether the confrontation was "so unnecessarily suggestive and conducive to irreparable mistaken identification that the suspect was denied due process of law." *Cf. People v. Patrick*, 53 Ill.2d 201; *People v. Reese*, 54 Ill.2d 51; *People v. Marshall*, 9 Ill.App.3d 1035; *People v. Mueller*, 54 Ill.2d 189.

In *Blumenshine, supra,* the confrontation was 19 days after the event; the record did not permit an "informed judgment" as to whether the identifications were of an independent source so the case was remanded for that determination.

■■ Even so, the independent-source exception may be used. (*People v. Bey,* 51 Ill.2d 262; *United States v. Wade,* 388 U.S. 218.) Was the "on the scene" identification herein so unnecessarily suggestive and conducive to mistaken identification that the defendant was denied due process of law? Prompt "on-the-scene" identification procedures were discussed in *People v. Elam,* 50 Ill.2d 214, where the court repeated its holding that this type of confrontation has been approved by the court and does not violate the principle announced in *United States v. Wade,* 388 U.S. 218; *Gilbert v. California,* 388 U.S. 263; and *Stovall v. Denno,* 388 U.S. 293. The court quoted with approval the language in *Bates v. United States* (D.C. Cir. 1968), 405 F.2d 1104, 1106, where the court said: "There is no prohibition against a viewing of a suspect alone in what is called a 'one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy. The rationale underlying this is in some respects not unlike that which the law relies on to make an exception to the hearsay rule, allowing spontaneous utterances a standing which they would not be given if uttered at a later point in time." The court further observed that such procedure fosters the desirable objectives of fresh, accurate identifications which may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing offender while the trail is fresh.

In *People v. Young,* 46 Ill.2d 82, the court suggested that police officers may be derelict in their duty should they fail to cause such a confrontation.

■■ In this case we find that the service-station confrontation within 15 to 30 minutes of the robbery was justified because prompt identification was necessary to determine whether defendant was the offender or whether the officers should continue their search.

■■ Further, in the instant case, it was shown by clear and convincing evidence that the in-court identification had an independent origin arising from other uninfluenced observation of the defendant. *People v. Bey, supra.* The witness had ample opportunity to view defendant for several minutes and gave a detailed description to the police immediately after the crime, which description matched that of the defendant.

■■■ Defendant contends that he was not proven guilty beyond a reasonable doubt because the victim failed to mention that defendant

had a moustache. Where identification testimony of a crime victim is positive, precise accuracy in describing facial characteristics is unnecessary, slight discrepancies do not destroy his credibility, and failure to notice the presence or absence of a moustache is a minor discrepancy. *People v. Carroll*, 12 Ill.App.3d 869, 879.

He argues that when arrested he did not have the gun or rolls of pennies in his possession. This ignores the fact that he was in a residence in the interim between the robbery and his arrest and had ample opportunity for a "drop off."

■■ While the evidence of alibi cannot be disregarded where the sole and only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime, it is equally true that the testimony of a single witness, if it is positive and the witness credible, is sufficient to convict even though it is contradicted by the accused. (*People v. Gardner*, 35 Ill.2d 564, 571.) It is our duty to carefully review the evidence, and if it is not sufficient to remove all reasonable doubt of the guilt of the defendant and to create an abiding conviction that he is guilty the conviction will be reversed. *People v. Kidd*, 410 Ill. 271; *People v. Botulinski*, 383 Ill. 608.

■■ Here the victim had sufficient opportunity to view the defendant, who was not masked, at close range, under daylight conditions for an ample amount of time to furnish a detailed description to the police. The witness was positive in his identification of the defendant.

An independent witness also gave the police a detailed description of an automobile he had observed leaving the area at a high rate of speed. The conclusion is inescapable that defendant's conviction was based on a positive and certain identification. The judgment of the Circuit Court of Rock Island is affirmed.

Judgment affirmed.

ALLOY and STOUDER, JJ., concur.