THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EUGENE D. MANION, SR., Defendant-Appellant.
Second District (1st Division)   No. 74-445

Opinion filed July 27, 1976.

Ralph Ruebner and J. Daniel Stewart, both of State Appellate Defender's Office, of Elgin, for appellant.

John J. Bowman, State's Attorney, of Wheaton (James Ryan and Malcolm F. Smith, Assistant State's Attorneys, and Edward N. Morris and Robert L. Janes, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The defendant, Eugene D. Manion, Sr., was convicted of armed robbery after a jury trial and sentenced to a term of 4 to 12 years' imprisonment with 5 years' parole. He appeals, contending that he was not proven guilty beyond a reasonable doubt. He also claims prejudicial trial error in the court's refusal to permit him to testify as to his prior conduct and training as a police officer to support his testimony that his apparent flight was in pursuit of the real robber.

In raising the reasonable doubt issue defendant is essentially questioning the probity of his identification at the scene of the robbery. Denise Staniszewski, a cashier at the Kresge store in Oak Brook, testified that at 3:50 p.m. on August 26, 1974, as she was walking back to her cage, she casually noticed a man talking on the phone. As she reentered her cashier's cage she saw the man pick up a gray shopping basket which had been on the ledge by the telephone. The man followed her and appeared at the small window of the cashier's cage, which on later measurement was found to be a 9-inch by 16¼-inch opening. She opened the window and asked him what he wanted. She testified that she believed that he had the shopping basket in one hand and a gun in the other. She saw only his face but said she got a good look at him in good lighting conditions. The man pointed the gun at her and threatened to kill her if she did not give him the money. She gave him the container of money in front of her. When he told her to give him more or he would kill her, she gave him a deposit bag. In all she gave the robber approximately $8600. She testified that the man was at the cashier's window for approximately 5 minutes before he left and she looked directly at his face each of the two times he asked for money. She also glimpsed at him through a window in an office door as he left, and, although she could see him from the shoulders down, she could not recall how he was dressed. She said he was middle-aged, not clean shaven and had shorter hair.

About 10 or 15 minutes later she was told that a suspect had been apprehended and she was taken to the parking lot outside of the Jewel store by an officer. When she was about 14 feet or so from a police car, she viewed defendant seated in the back seat and, after she looked at him for three or four minutes, she told the police that defendant was the one who had robbed her. Although she was very upset, there was no doubt in her mind as to the identification. She additionally identified the defendant in court as the man who had robbed her and as the same man who was in the rear seat of the squad car.

After the robber left Denise reported to the assistant manager while another employee called the police. Denise admitted that immediately after the robbery she was unable to give the police a description of the robber on the phone.

Cheryl Brown, another Kresge employee, testified that she saw a man run "slowly" out the door. She was about 6 feet from him and could see his face and clothing. She testified that the man wore a dark shirt and dark pants and some kind of white underclothing under the darker shirt. He was carrying a gray shopping basket under his arm. She could not recall anything about his physical appearance or whether he wore a hat or glasses. She saw the man in front of the store still carrying the basket and being chased by the assistant manager, Mr. Daniels.

Gary Daniels, an assistant manager of Kresge's, also identified the defendant as the robber. He testified that when the cashier turned and said she had been robbed, he ran out the door of the office and saw a man "sort of half-running, half-walking" to the door with a shopping basket under his arm. When Daniels first saw him the man was approximately half-way between the office and the door, about 15 feet away. Daniels tried to cut through a display of bicycles, fell as he came within a couple of feet of the man, and got up and ran out the door. The man proceeded across the driveway in front of the store towards the parked cars. At this point Daniels was about 15 to 20 feet from him.

Daniels testified that as the robber ran into the second or third row of the parked cars he turned and pointed a gun at him and told him to stop chasing him or he would shoot. At that time Daniels was in one row of cars and the man was in the next row of cars facing him with the driveway separating them. He observed that the man was unshaven and "bearded" but he did not notice too much about how he was dressed, except that he had a brown shirt on at some time when he observed him. The witness ducked down behind a car, as did the suspect, and Daniels lost sight of him for about 3 or 4 seconds, but kept his eye on a yellow car behind which the man had disappeared. He resumed the chase when he saw the man running from the yellow car and at this time he noticed a police car was coming. He saw the man run up to the police car and say something and then continue running. Daniels ran to the car and told the officer that the man had robbed the Kresge store. The officer got out of the car and pursued the man. The only time that Daniels lost sight of the man was the 3 or 4 seconds when the man ducked down by the yellow car.

At this time he saw the officer leave his car and chase the man. Daniels saw the man run around the side of a green car which he thought the man had entered. He then saw, however, that the man had not entered the car but was again running. After the officer caught up with the man the witness testified that he returned to the yellow car and found a brown shirt "rolled or balled up" beneath the car. The entire chase took approximately a minute to a minute and one-half. Daniels said that the man he saw at the squad car was the same man he had chased. When he saw the man in the squad car, however, he noticed that he had a white

shirt on. The witness made an in-court identification of the defendant as the robber he had seen and chased.

Defendant was also identified by Robert Keifer, who was employed as an assistant manager trainee at the Kresge store. He testified that when he saw Daniels chase a man with a shopping basket from the Kresge store into the parked cars he joined the pursuit and at one point, when he was about 25 or 30 feet away from the man, the man turned and pointed a gun at both Daniels and him. He said that the man was wearing a brown shirt, a blue and white baseball cap and he had a goatee beard. The witness corroborated Daniel's version of the chase. He also added that when the man ducked down behind the yellow car he was carrying a shopping basket and when he reappeared in several seconds he was no longer wearing the brown shirt and baseball cap but was, instead, wearing a white shirt and he was still carrying the shopping basket. He said that the entire chase took about 2 to 4 minutes and that he never lost sight of the man for more than 5 or 6 seconds, except periodically losing sight of him for a few seconds as both he and the man ducked while running through the rows of parked cars. Neither Keifer nor Daniels saw anyone else running in the parking lot other than the defendant.

Mary Dyhrberg, the driver of the green car which Daniels mistakenly thought the man had entered, testified that as she was backing out of her parking slot a man came around to the side of her car and opened the door. She stated that she screamed and then accelerated away from the immediate area of the chase. She said that he had a beard like a goatee and was wearing a white T-shirt and light trousers. Later that evening she identified the defendant from a series of five or six photographs. She also made an in-court identification of the defendant.

Paul Tadelski, a police officer of the Village of Oak Brook who apprehended the defendant, stated that while on patrol in the Oak Brook Shopping Center, he saw a white male crossing 15 to 25 feet in front of him with a basket under his left hand and a dark colored object in his right hand. The man stopped about 20 to 25 feet in front of him, turned towards him and then pointed at Daniels and Keifer who were coming over a hill. The man stated, "Stop those guys. They are chasing me." Tadelski got out of his car and turned on his portable radio and heard a dispatch about a robbery at Kresge's. Tadelski then chased the man for about four or five parking aisles until the man turned around and pointed at Tadelski what he thought to be a weapon. Tadelski was then about 20 to 30 feet away. Both Tadelski and the man ducked down for a period of approximately 15 or 20 seconds.

The officer testified that he saw the subject's face and what appeared to be the beginning of a goatee type beard. Tadelski also noticed that the man did not have the basket with him after he began running again.

Tadelski said that he drew his revolver and saw the man run another 25 to 30 feet and then go around to the passenger side of a slow moving automobile and open the car door. He watched the vehicle stop and then speed away from the man. He saw the man turn and resume his running at which time the officer ordered the man to halt. The man at that point had the weapon in his hand and he dropped down behind a car. He was out of Tadelski's sight for no more than 5 to 10 seconds but came up in view about two cars west of where he originally had been. At this point Tadelski noticed that there was no weapon in the man's hand. The subject was wandering around and mumbling, "Why are you chasing me? The real guy is getting away. What are you hassling me for?" Tadelski identified the defendant in court as the man who was placed under arrest at that time and as the man he had chased.

Defendant testified, essentially, that he and three of his children had been shopping in the Kresge store. They drove away and then decided to drive back and buy a terrarium for defendant's wife. The defendant said he asked his oldest daughter to come back into Kresge's with him to get the terrarium. However, as they were getting out of the car they heard shouting and saw three men; one man, wearing a blue cap and a brown shirt and carrying a shopping basket, was running and the other two men were chasing him. The defendant said the man being chased was about 125 feet from him. Defendant stated that he assumed the man was wanted for shoplifting. Defendant went to the trunk of his car and got out his gun which was in its holster. He shut the trunk and went to the front door, opened it, threw in the key and holster which was later found under the front seat. He then took two cans of mace from the car, shut the door and told the five children to stay there. He said he saw the man running and ducking down as he ran through the parking lot in an attempt to overtake him. When the man ran into the next parking lot with defendant in pursuit, defendant told him to drop the basket and stop. The man turned, threw the basket down and continued to run. At this point defendant noticed that he had a goatee or beard. Defendant stated that he ran over to the basket and saw a bag containing money. He took the basket and threw it underneath the car so that no one would pick it up. As he did this his mace, which was in the same hand as the basket, went with the basket under the car.

Defendant continued pursuing the man. In the course of pursuit he jumped out of the way of a car and at this point he noticed that the man, who was now 75 feet from him, did not have the brown shirt or the cap on. During his chase of the man, defendant found the brown shirt and cap. When he saw that there were squad cars in the parking lot, he waved the shirt and hollered, "This way." He then threw the shirt down and continued to run. Defendant testified that as the man was getting further

away a police car pulled in front of defendant and told him to stop or he would shoot, and that although he did stop and throw his gun down he told the policeman that he had done nothing wrong and the guilty party was escaping.

Manion testified that he was 45 years of age, and had been a police officer, first with the Chicago Park District and then with the Chicago Police Department from 1959 to March 1, 1973. On that date he was suspended because he lived outside the city of Chicago but he believed that he would have been reinstated within the next 3 or 4 weeks. He carried a gun because his life and his family had been threatened.

Defendant accounted for the money he had on his person and the amount which he had spent on that day, stating that he had cashed an unemployment check and had taken other money from home with which to pay a house payment. He said that he had gone into Kresge's with three of his children to get a K-Mart credit application and he identified a K-Mart credit application as one that he had obtained. He said that when he was in the store he wore tan striped pants and a T-shirt with no shirt over his T-shirt. He did not wear a cap. He identified the cap found in the parking lot as the one he had seen on the man whom he was chasing.

Several of defendant's children essentially corroborated defendant's version of why he had been in the shopping center and where he had been. Other witnesses on defendant's behalf, who had seen him earlier in the day of the robbery, testified that he was wearing a white T-shirt and the striped pants.

There was also testimony that the hair on the cap which was found in the parking lot was not Eugene Manion's, and further that the identifiable latent fingerprints on the shopping basket did not match Manion's fingerprints. Finally, a witness who testified for defendant stated that earlier in the day she had seen the defendant's cap and a gun in a holster in the trunk of his car.

■■ Where "the evidence is irreconcilably conflicting, it is the peculiar prerogative of the trier of fact * * * to ascertain the truth." *(People v. Hammond,* 45 Ill. 2d 269, 278 (1970).) We may not substitute our judgment for that of the jury on questions involving the weight of the evidence or the credibility of witnesses and we will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt. *(People v. Stringer,* 52 Ill. 2d 564, 568 (1972).) Further, where the identification of the accused is the issue the testimony of even one witness is sufficient to convict, although the testimony is contradicted by the accused, providing the witness is credible and the view was under such circumstances as would permit positive identification. *People v. Stringer,* 52 Ill. 2d 564, 569 (1972).

■■ Defendant complains that his identification by the two female

Kresge clerks made at the scene of his apprehension was impermissibly suggestive since he was sitting in the back seat of a squad car with his hands handcuffed behind his back. Prompt in-custody identification by an occurrence witness is permissible where the witness has a good opportunity to view the suspect at the time of the crime. This is true even when the suspect's identification takes place while he is seated in a police car. (See, *e.g., People v. Elam,* 50 Ill. 2d 214, 216-18 (1972); *People v. Ellis,* 24 Ill. App. 3d 870, 872, 881 (1974).) Accordingly, we find defendant's contention to be without merit.

■■ Here, there was positive identification by Denise Staniszewski whose opportunity to observe the robber was excellent. Although she could only see the robber's face, she looked at him each of the two times he asked for money. The fact that she could not recall how the robber was dressed and was not able to give a detailed description to the police department on the telephone shortly after the robbery does not make her positive identifications prior to and at trial incredible under the circumstances. Where identification testimony of a crime victim is positive, precise accuracy in describing facial characteristics is unnecessary and slight discrepancies do not destroy the witnesses' credibility. *People v. Ellis,* 24 Ill. App. 3d 870, 882 (1974). See also *People v. Perry,* 21 Ill. App. 3d 18, 22 (1974); *In re Williams,* 24 Ill. App. 3d 593, 596-97 (1974).

In addition, there was a positive identification by Cheryl Brown who saw both the man's face and clothing from only 6 feet away and who stated that she saw the man from the front and that he was wearing dark pants and a dark shirt with white underclothing under the shirt and he was carrying a shopping basket under his arm. She, as well as Denise, was able to make a positive identification of the defendant within 10 or 15 minutes after the robbery.

Moreover, the further identifications by Daniels, Keifer and Officer Tadelski were made upon an adequate basis to be afforded credibility by the jury.

■■ The essential contention of the defendant, that his testimony and that of his children was far more probable than the conflicting evidence presented by the State, is of course, attractive. It is difficult to believe that a police officer who is suspended for reasons other than dereliction of duty would take his children with him to a shopping center and there engage in an armed robbery. However, the trier of the facts was not required to believe the testimony which conflicted with the positive identification by the witnesses for the State and we may not substitute our views for that of the jury. We must therefore conclude that the evidence proved that the defendant was guilty of the armed robbery beyond a reasonable doubt.

Defendant also claims that the court erred in refusing to permit him to testify that although a suspended police officer, he acted in accordance with the Chicago Police Department's policy that an officer is on duty 24 hours a day, or that he had previously engaged in pursuit of law violators under circumstances similar to this case. He claims that in view of the serious conflict in the evidence the exclusion of his testimony was highly prejudicial to him and requires a reversal and remand for a new trial.

The defendant testified that the Chicago Police Department's policy was that a police officer is on duty 24 hours a day and that if he witnesses a crime he should take immediate action to preserve life and property. He was, however, prevented from stating whether as a suspended police officer he was bound by this policy or whether he had ever acted in accordance with it in the past. He contends that he was entitled to present the evidence supporting an explanation for his ostensible flight through the parking lot in order to show an innocent mental state.

■■ It is, of course, clear that a defendant may present an explanation of his flight compatible with his innocence. It has been held that evidence of defendant's mental state at the time he fled from the scene is therefore competent and proper. (See *People v. Montgomery,* 16 Ill. App. 3d 127, 133 (1973).) Here, however, defendant was permitted to explain to the jury that he had been attempting to apprehend an apparent shoplifter. He was permitted to testify as to the Chicago department's policy of a police officer being on duty 24 hours a day. Though suspended, he was not prevented from using the Chicago Police Department policy to explain his motivation or state of mind. The court properly ruled that he was not entitled to go further and give evidence of similar conduct on other occasions because it would not tend to prove that he was not the armed robber on this occasion. See *People v. Ruel,* 120 Ill. App. 2d 374, 379 (1970).

For the reasons we have stated we affirm the judgment.

Affirmed.

GUILD, P. J., and HALLETT, J., concur.