THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MARIO RUFFOLO, a/k/a Rocco Ruffolo, Defendant-Appellant.

Third District   No. 77-456

Opinion filed September 20, 1978.

Louis Carbonaro, of Carbonaro & Carbonaro, of Chicago, for appellant.

Edward Petka, State's Attorney, of Joliet (James E. Hinterlong and John X. Breslin, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE BARRY delivered the opinion of the court:

This appeal was brought by the defendant, Mario Ruffolo, from a conviction for armed robbery. The basis of the appeal is the trial court's denial of motions to suppress the evidence.

According to the testimony given at the trial, Eliezer Ventura was robbed of $21,000 at approximately 9:30 p.m. on August 12, 1976. The incident occurred when Ventura stopped at a 7-Eleven Store on his way home from work. The victim, comptroller of the Scala Packing Company, was carrying the drivers' receipts and deposit slips in a brown manila envelope inside of a black athletic bag marked with the word "TIME" in red letters.

As Ventura left the 7-Eleven Store, he was accosted by a man who said he had a gun and demanded the money in Ventura's car, refusing to take the money Ventura offered out of his pockets. The man's hand was on an object in his waist which looked like a gun.

After receiving the bag from Ventura, the man ran south from the 7-Eleven Store to a car and rode away. The car was an American model with a white body and brown or red top, and with three or four round taillights. Ventura admitted that it was not too bright where the car was parked, but said he could see it. From the time he was first approached until he handed the bag to this individual about a minute elapsed but he looked at the assailant's face for only about 10 seconds.

After the robber left, Ventura returned to the 7-Eleven Store and asked the sales clerk to call the police. The call was answered by Officer Ingram of the Bolingbrook Police Department. After a conversation with Ventura, Officer Ingram notified District Five State Police of the armed robbery and location, so they could broadcast a message to all State police cars in the area. The message included Ventura's description of the automobile, subject and property taken. Ingram testified at trial that the description of the man was that he was 5 feet 8 inches tall, with dark hair, wearing shorts and a sleeveless T-shirt with a U-type neck, and spoke with an accent. The subject was described as armed with a blue-steel

weapon. The message also included Ventura's description of the car, a description of the black bag with the letters T-I-M-E written on the side in red, and a statement that the total amount of money taken was $21,000.

The radio dispatch about the robbery was heard at about 9:35 or 9:40 p.m. by Officer Silverman of the police department for the Village of Shorewood, located southwest of Bolingbrook. Silverman made some notes about the message on a note pad.

Silverman testified that at about 10 p.m., while proceeding eastbound on Route 52 near the exit ramp for I-55, he observed a vehicle similar to the one described in the dispatch come off the ramp and proceed westbound on Route 52. As Officer Silverman passed the vehicle, he observed one of the individuals in the car and made a U-turn. After he made the turn, the vehicle, which Silverman described as having a rust colored top over a white body, also turned around and headed back eastbound. Silverman also turned around, but then lost sight of the vehicle.

After losing sight of the vehicle, Silverman drove to the Holiday Inn in Shorewood near I-55. When he arrived at the Holiday Inn, he saw the same vehicle and watched the two occupants get out of the car from a distance of 30 to 40 feet. Silverman, who said the parking lot was lit up with overhead Mercury vapor lights, testified that the driver was a large white male, who may have had a small beard at the time. The passenger was a shorter white male, wearing a pair of short pants and a white sleeveless T-shirt. The shorter man, who was the passenger, had dark brown or black hair which was windblown and stuck out. The driver was carrying a black bag with red lettering, but Silverman admitted that he could not read the lettering. Officer Silverman watched the two men enter the motel and then radioed for assistance.

When Officer Toomey of the Shorewood Police Department arrived, both police officers entered the motel and spoke to the two desk clerks on duty. Deborah Nink, one of the desk clerks working on August 12, 1976, testified that two men came in about 10:15 p.m. and wanted room number 186. The sign-in sheet was filled out by the taller man, whom she identified as Bertucci, a co-defendant. She identified the defendant as Bertucci's companion.

After speaking to the desk clerks, Silverman went outside to the area of room 186 and waited behind a fence. With him from time to time were Officer Toomey and two deputies from the Will County sheriff's police. Silverman testified that he began his surveillance of room 186 at about 10:10 to 10:15 p.m.

At approximately 10:25 or 10:35, the two men came out of room 186. Officer Silverman and the two deputies approached the two men. Silverman asked one of the men for identification and he produced an Illinois Firearms Identification Card. At trial Silverman identified Bertucci

as the one who produced the Illinois Firearms Identification Card. He identified the defendant as the man with Bertucci.

Silverman then asked Bertucci if he had come in the vehicle Silverman had seen before, and Bertucci said that he had. Silverman, who had received the Holiday Inn sign-in slip, which did not contain the same license number as the car driven by Bertucci, then asked Bertucci if he knew his license number and Bertucci did not know what the number was. Silverman testified that he asked Bertucci what they were doing in Joliet and Bertucci told him they had come to visit a friend named Rick, but that he did not know Rick's last name and did not know where he lived. Silverman asked Bertucci if he had been in Bolingbrook that night and Bertucci said that he had been there.

At that time Silverman and two other officers brought Bertucci and Ruffolo around to the front of the Holiday Inn near their vehicle. At a hearing on a motion to suppress, Silverman testified that he probably commanded the men to come with him and that the police took them around by the car and leaned them against the trunk of the car. Silverman also admitted that if the men had tried to escape when he met them outside the motel room, he would have tried to stop them.

Meanwhile, Mr. Ventura was being transported to the Holiday Inn by Officer Swiderski of the Bolingbrook Police Department. When the police car arrived, at about 10:20 p.m., and Ventura saw the shorts, Ventura said, "That's him. Oh, my God, what will I do." At trial Ventura testified that the man he saw in the Holiday Inn parking lot was the man who robbed him. On cross-examination, Ventura testified that the man whom he picked out in the Holiday Inn parking lot was wearing shorts, and he identified the man in the parking lot as the robber solely by means of the shorts he was wearing. He could not identify the face of the robber, which he observed for only 10 seconds. When asked to compare the face of the man he saw at the Holiday Inn with the face of the robber, Ventura admitted that he was not sure that it was the same face. At trial, however, Ventura was asked whether there was anyone in the courtroom who looked like the robber, and testified that he did not remember. On cross-examination, Ventura was again asked whether he could identify the robber, and he admitted that he could not recollect the face.

Silverman testified that after the Bolingbrook police arrived, he was informed that the Bolingbrook police wanted the two individuals to be arrested. Silverman personally conducted a pat-down search of defendant Ruffolo, but took nothing from him, and then handcuffed him and placed him in one of the Shorewood police cars. Later he was placed in a Bolingbrook squad car.

Officer Swiderski testified that he then went into the motel and contacted a Mr. Goldstein from the State's Attorney's office and requested a search warrant for the motel room occupied by Bertucci and Ruffolo.

Goldstein came to the motel and assisted in preparing a search warrant, which took about six or seven hours.

At about 5:15 a.m., Swiderski, with Lieutenant Sanford and Officer Ruble of the Bolingbrook police, entered the motel room, Swiderski searched the dresser and then checked the bed. Between the box spring and the mattress, Swiderski found bundles of money folded into two towels. Swiderski turned the money over to Lieutenant Sanford.

Lieutenant Sanford testified that he arrived at the motel about 12:15 or 12:30 p.m. and ordered some officer to take the two men in custody to the Bolingbrook police station. At about 5:30 a.m., he participated in a search of room 186, resulting in the recovery of two bundles of money, from underneath the bed. The money was turned over to Officer Ruble of the Bolingbrook Police Department. Sanford admitted that the money was not sent to the laboratory for fingerprint examination.

At the police station all property was removed from both defendants and placed in a locker. Donald McKenzie, formerly a Bolingbrook police officer, testified that both Bertucci and Ruffolo had a large amount of change in their pockets. The total amount was $75 or $76, including change and currency.

Raymond B. Green, owner of Green Shield Security, a private security agency in Joliet, testified that he patrolled various businesses and locations in the Joliet area, including the Holiday Inn West in Shorewood. In the early morning hours of August 13, Green assisted the police officers in searching the motel. Green testified that on the roof of the motel he found a black bag with the red lettering "TIME." There were some envelopes and checks lying beside the bag.

Claude Ruble, an evidence technician for the Bolingbrook Police Department, testified that he made plaster casts of two partial tire prints at the crime scene area near the 7-Eleven Store. Ruble also had the tires removed from the car seized at the Holiday Inn and made comparisons. He testified at trial that the tread designs were similar but that there were an insufficient number of identifiers to say positively that the tires on the car made the tracks at the 7-Eleven Store.

Officer Ruble also testified that he was present when the checks from the black bag and the currency from the motel room were counted. The checks totaled $11,205.00 and the currency totaled $9,591.00. Ruble further testified that the crime lab was not able to find any fingerprints on the gun which was taken from the car. Ruble did not attempt to take any fingerprints from the torn coin envelopes found in the black bag, and he did not take any fingerprints from the car found at the Holiday Inn. Ruble admitted that it was possible to take fingerprints from currency, but said he did not take any latent prints from the currency found in the room and did not have the knowledge or technology available to do that.

After the search warrant was executed on the motel room, John Perona,

an Illinois State policeman, along with Officer Ruble, searched and inventoried the contents of the car driven by Bertucci because it was going to be impounded by the Bolingbrook police with the authorization of Mr. Goldstein. Prior to impounding the vehicle it was determined that neither subject was the registered owner and that the registered owner could not be contacted. Perona took a slide rule and butcher knife from the glove compartment and a loaded .38-caliber Smith & Wesson revolver from beneath the passenger's seat and gave them to Officer Ruble. Perona was careful not to damage any fingerprints that were on the gun. At trial, Officer Perona identified the gun which was seized. The vehicle was subsequently towed.

Prior to trial, co-defendant Bertucci filed a motion to suppress evidence in which the trial court allowed the defendant Ruffolo to join even though he did not file a motion to suppress and his attorney was not present at the hearing on the motion to suppress. The hearing on the motion to suppress dealt only with whether there was probable cause for the search warrant to issue for the motel room and whether the inventory of the automobile, prior to towing, was lawful. After the hearing, the motion was denied.

■■ The defendant raises four issues for review. However, the State argues that every one of these issues was waived by the defendant either because the issue was not specified in Bertucci's suppression motion or because, although the defendant was allowed to join in Bertucci's oral motion to suppress, the defendant, unlike Bertucci, never filed a written motion. It is fundamental to our system of justice, however, that evidence seized illegally as the result of an unlawful search or arrest should be suppressed. As a result, any error which may have been made by the trial court would affect substantial rights of the defendant and would be plain error. (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a).) Where there is a possibility that the trial court committed plain error, a reviewing court can consider the issue to determine whether plain error has in fact been committed. (*People v. Smith* (5th Dist. 1976), 42 Ill. App. 3d 731, 356 N.E.2d 656.) Therefore, the issues raised by the defendant will be considered.

Whether there was probable cause for the arrest of the defendant is the first issue to be considered. An arrest is a taking into custody of a person by either actual restraint or his submission to custody. (*People v. Wipfler* (3d Dist. 1976), 37 Ill. App. 3d 400, 346 N.E.2d 41.) Probable cause justifying an arrest without a warrant exists if the totality of facts and circumstances known to the officer at the time of the arrest warrants the belief by a prudent person that an offense has been committed and that the person arrested committed the offense. *Henry v. United States* (1959), 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168; *People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280; *People v. Galloway* (1956), 7 Ill. 2d 527, 131 N.E.2d 474.

■■ Officer Silverman, at the time of making the arrest, was aware that a robbery had occurred less than an hour earlier. He also knew that the defendant was riding in a car similar to the one used by the robber, that the defendant's physique and dress fit the description of the robber broadcast over the police radio, and that the defendant's companion had carried a black bag with red lettering from the car to the motel. Furthermore, after the defendant and Bertucci were stopped for questioning, the victim identified the defendant as the robber. Given Officer Silverman's knowledge of these facts and circumstances, there was sufficient probable cause for the arrest absent an arrest warrant.

Having decided that the arrest was lawful, we need not consider whether the evidence seized pursuant to the search warrant issued for the motel room was the fruit of an unlawful arrest. However, the defendant contends that the identification of the defendant in the motel parking lot was the result of an illegal showup.

● 3 Evidence of an identification is inadmissible where the identification of the accused resulted from unnecessarily suggestive circumstances, conducive to an irreparable mistaken identification. (*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967; *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152.) However, not every viewing of a suspect, other than in a lineup is a denial of due process (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152), for the law does not require a lineup where justifying or saving circumstances exist. (*People v. Sanders* (5th Dist. 1972), 4 Ill. App. 3d 494, 280 N.E.2d 269.) A one-person showup within a short time of the commission of the offense is justified because a prompt identification is necessary to determine whether the offender has been apprehended or whether the police should continue the search. *People v. Estes* (4th Dist. 1976), 37 Ill. App. 3d 889, 346 N.E.2d 469; *People v. Ellis* (3d Dist. 1974), 24 Ill. App. 3d 870, 321 N.E.2d 722.

■■ Certainly a showup within 50 minutes of the crime is justified to determine whether the search for an armed robber ought to continue. Nevertheless, the defendant argues that the inability of the victim to make any later identification proves the suggestive nature of the circumstances surrounding the showup. We disagree. The victim admitted that the identification in the parking lot was based on the clothes worn by the defendant and that, due to an inability to view the robber's face, a later identification was impossible. This indicates that the circumstances surrounding the showup were not so suggestive as to cause an irreparable mistaken identification. The victim did not make a later identification based on his earlier identification of the defendant. Instead, he admitted he could no longer identify the defendant as the robber but stated that the man he identified in the motel parking lot was the robber. The facts that the victim based his identification of the defendant on the defendant's

general appearance and that the victim was unable to make any other identification go to the credibility of the victim and the weight to be given his testimony. This is a matter for the jury, not a reviewing court.

■■ Lastly, we consider the issue of whether the search of the car was a proper inventory search. As a general rule, once the defendant is in custody, there is time for the police to obtain a warrant authorizing the search of a legally parked vehicle, and no exigent circumstances for the seizure of the vehicle exist. (*Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022; *People v. Von Hatten* (4th Dist. 1977), 52 Ill. App. 3d 338, 367 N.E.2d 556.) Nor do the facts that the vehicle was an instrumentality of the crime and it was in plain view at the time the defendant was taken into custody justify a warrantless seizure of the vehicle. *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022.

■■ Where a seizure is proper, an inventory search of an automobile may be made for the protection of the police officers from potential dangers, for the protection of the owner's property, for protection against later claims that property has been lost or stolen (*People v. Clark* (1976), 65 Ill. 2d 169, 357 N.E.2d 798), to respond to incidents of theft and vandalism and to determine whether a vehicle has been stolen and thereafter abandoned. *South Dakota v. Opperman* (1976), 428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092.

■■ Prior to impounding this vehicle, it was determined that neither the defendant nor Bertucci was the registered owner of the vehicle. Furthermore, the registered owner could not be contacted. It was proper, therefore, for the police to seize the vehicle to determine whether it had been stolen and to preserve anything therein from the possibility of theft and vandalism. Hindsight affords us the luxury of realizing that a search warrant for the vehicle could have been obtained at the same time as the search warrant for the motel room. Nevertheless, to suggest that the police should not have seized the vehicle without the warrant is unreasonable. Once it was determined that there existed a possibility the vehicle was stolen, a guard would have to be assigned to the vehicle while the warrant was sought, and placing a guard on a vehicle is no less a seizure than is towing it away. (*People v. Peter* (1973), 55 Ill. 2d 443, 303 N.E.2d 398.) Therefore, we believe the seizure was justified and the inventory search incident to the seizure was proper.

Accordingly, the judgment of the Circuit Court of Will County is affirmed.

Affirmed.

ALLOY and STENGEL, JJ., concur.