(No. 48821.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EUGENE D. MANION, SR., Appellant.

*Opinion filed September 20, 1977.*

566

Ralph Ruebner, Deputy Defender, and Daniel Cummings and Alan D. Goldberg, Assistant Defenders, of the Office of the State Appellate Defender, of Elgin, for appellant.

William J. Scott, Attorney General, of Springfield, and J. Michael Fitzsimmons, State's Attorney, of Wheaton (Donald B. Mackay, Raymond J. McKoski, and Dale M. Bennett, Assistant Attorneys General, of Chicago, of counsel), for appellee.

MR. JUSTICE CLARK delivered the opinion of the court:

Eugene Manion was convicted of armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 18—2) in a jury trial and sentenced to not less than 4 years' but not more than 12 years' imprisonment. The appellate court affirmed (40 Ill. App. 3d 362), and we allowed defendant's petition for leave to appeal. The issues raised are whether the identifications of defendant were proper, whether the limitation on the presentation of his defense was correct, and whether he was proved guilty beyond a reasonable doubt.

Defendant contends that the one-man "showup," at which he was identified by two witnesses shortly after the robbery, was unnecessarily suggestive and violative of due process. Testimony about this out-of-court identification should not have been permitted, he contends, and the in-court identification of defendant by these two witnesses

should not have been allowed because it was based on the showup.

At 3:50 p.m. on Monday, August 26, 1974, a man, armed with a gun and holding a shopping basket, demanded money from Denise Staniszewski, a cashier at Kresge's store in Oak Brook. Staniszewski testified that, as she was walking back to the cashier's cage from the register, she had noticed a man with a gray shopping basket talking on the telephone. The man followed her, appeared at the window of the cage, pointed a gun at her while holding the basket, demanded money, and left with $8,600, some of it in a white bag. (She did not actually see the robber place the money in the basket, the record indicates.) She saw only his face and the gun through the cage window, approximately 8 by 16 inches, and caught a glimpse of the robber through the window of the door to the cage. The whole area was well lighted, she said. Although unable to give a detailed description over the phone to the police immediately after the robbery, she had observed the robber's face twice during the ordeal and described him as middle-aged, not clean shaven, and with shorter hair. Ten to fifteen minutes after the robbery, she and another Kresge employee, Cheryl Brown, were asked to accompany Gary Daniels, an assistant manager of Kresge's, and a police officer, who stated police were holding a suspect, to the nearby Jewel parking lot to make an identification. Upon arriving, she saw a man in the back seat of a police car. She estimated she was within 14 feet of the suspect for three minutes or so when she identified him as the robber. Staniszewski admitted she was upset at the time and could "possibly" have been afraid to peer into the car because she was fearful of seeing the robber, but she had no doubt that the suspect in the car was the robber; and she had no doubt that the defendant, Manion, at trial was the same man who robbed her and whom she identified 15 minutes later.

Cheryl Brown testified that she had been working just inside the door of Kresge's when she first observed a man, six feet away, running slowly, carrying a Kresge shopping basket and wearing dark clothing with a white garment beneath the shirt. She observed the man 5 to 10 seconds. Gary Daniels was chasing the man she said. Ten to fifteen minutes later, a policeman took her and Staniszweski to the Jewel parking lot. They were accompanied by Daniels. After observing Staniszewski approach the squad car with a suspect in it, Brown came within five to six feet of the car and identified the suspect as the man she saw fleeing the store. She also testified that she was quite upset and spent a couple of minutes looking at the detained man and that he wore a white T-shirt which momentarily confused her. However, she testified she was certain of her identification and she identified defendant, in court, as the man who fled the store and who was seated in the squad car 10 to 15 minutes after the robbery.

The defense maintains that the unnecessarily suggestive nature of the identification resulted from the police stating to the two women, shortly after the robbery, that they were holding a suspect for identification and from seeing defendant handcuffed and alone in the squad car at the time of the identifications. Furthermore, defendant contends that since he was in custody, there were no exigent circumstances justifying the one-man showup. *People v. McMath* (1970), 45 Ill. 2d 33, is cited by defendant as authority for this. Although it is true that such showups are not favored and are even condemned, they have been justified where it was uncertain a victim would survive, a witness had an excellent opportunity to observe the defendant during the commission of the crime, the identified person was known to the witness before the commission of the crime, the suspect had unusual distinguishing characteristics, or, as in *McMath* itself, prompt identification was necessary for the police to determine

whether or not to continue their search. 45 Ill. 2d 33, 36.

First, we believe the identification of defendant in the Jewel parking lot by the two women can be justified on the bases of both witnesses' opportunity to view the robber and of the facilitation of the police search. In *People v. Elam* (1972), 50 Ill. 2d 214, a defendant was identified by a witness, who had been a passenger in a bus, while the defendant sat in a squad car with two policemen and another witness who had been driving the bus when the defendant robbed him. This court said such "prompt on-the-scene" identifications are "common in the apprehension of criminal offenders" and even necessary. (50 Ill. 2d 214, 218.) This court, in *Elam* (50 Ill. 2d 214, 218-19), cited *People v. Young* (1970), 46 Ill. 2d 82, 87, which stated:

> "Indeed, in our opinion, police officers who failed, in circumstances like these, to determine at once whether or not the victim of the crime could identify the men in custody as the men who had committed the crime, would be subject to criticism."

We believe the police acted properly, under the circumstances, in the case before us.

Both Staniszewski and Brown had the opportunity to see the robber inside the store. Staniszewski could plainly see his face through the window of the cage when he demanded the money and, almost immediately after, Brown had a frontal view of the robber slowly running and pursued by Daniels, as she testified. Defendant's brief points out that Brown was not a witness to the crime itself. Technically, that may be, but only seconds intervened between the crime and her view of the running suspect. Moreover, even if she did not have the opportunity to view the suspect during the actual commission of the crime, her identification would nevertheless corroborate those of Staniszewski and Daniels and Robert Kiefer,

an assistant manager trainee at Kresge's. (The latter two chased the suspect through the parking lot outside Kresge's. Their testimony is discussed below.)

Second, we find that the recent decision by the United States Supreme Court in *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, necessitates rejection of defendant's arguments. In *Manson,* the Supreme Court unequivocally adopted the *Stovall v. Denno* ((1967), 388 U.S. 293, 18 L. Ed. 2d 1199, ·87 S. Ct. 1967) approach of "totality of the circumstances" and rejected a *per se* approach to determine the admission of suggestive out-of-court identification evidence. The *per se* test would exclude identification or confrontation evidence "without regard to reliability, whenever it has been obtained through unnecessarily suggested confrontation procedures." 432 U.S. 98, 110, 53 L. Ed. 2d 140, 151, 97 S. Ct. 2243, 2250-51.

The *Stovall* test of totality of the circumstances, on the other hand, "permits the admission of the confrontation evidence if, despite the suggestive aspect, the out-of-court identification possesses certain features of reliability." (432 U.S. 98, 110, 53 L. Ed. 2d 140, 151, 97 S. Ct. 2243, 2251.) In other words, evidence of an unnecessarily suggestive identification may nevertheless be admitted at trial if reliability of the identification, under the totality of circumstances, is shown. The Supreme Court in *Manson* further held that in assessing the reliability of an identification, the factors set out in *Neil v. Biggers* (1972), 409 U.S. 188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, are to be considered. Those factors are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

We have previously considered the first factor. The degree of attention of the two witnesses was more than casual or passing, since the suspect, for both of them, was the clear focus of their attention even if for only a short time. Although Brown did not give a description following the crime and Staniszewski testified she could not give a detailed one, the lapse of only 15 minutes at most would seem to justify the lack of detailed descriptions. As for the level of certainty of the two women, it is clear from the record that they made positive identifications at the confrontation and expressed no doubt about it.

Accordingly, we find that the out-of-court identifications, even though suggestive, were reliable under the totality of the circumstances. We also find it unnecessary to reach the issue of whether the in-court identification was proper. See *Manson v. Brathwaite* (1977), 432 U.S. 98, 110 n.10, 53 L. Ed. 2d 140, 151 n.10, 97 S. Ct. 2243, 2251 n.10, where the Supreme Court said any identification in the "wake" of a reliable out-of-court identification is admissible.

Defendant's next contentions are that he was denied his right to present a defense because the trial court refused to allow him to explain his actions with testimony concerning prior off-duty arrests he had made and that he was not proved guilty beyond a reasonable doubt.

Other testimony by State's witnesses also established that a man in a brown shirt and dark pants ran out of the Kresge store. Gary Daniels testified that as soon as he heard Staniszewski, who was standing near him, say she had been robbed, he ran out of the office, tripped over a bicycle display located near the exit, and ran after the man into a parking lot in front of the store. In the lot, Daniels testified that twice the man turned and pointed a gun at Daniels, the second time just before the fleeing man ducked near a yellow car. Daniels described that man as having a small handgun, being unshaven, and wearing a

brown shirt. The man, whom Daniels did not notice as being dressed differently after resuming the chase from the yellow car, ran to an Oak Brook police car, stopped momentarily, and continued running. Daniels said he, Daniels, also ran to the police car, told the police officer the running man had robbed Kresge's, and watched the policeman pursue the man. Daniels saw the fleeing man run to the side of a slowly moving green car, briefly lost sight of him, and saw him running again. Daniels watched the chase until the policeman caught up with the man, at which time Daniels returned to the yellow car, where he found a brown shirt which he gave to the police. He then returned to the store and accompanied the two women and policeman to the Jewel parking lot, where he identified the man sitting in the police car as the man he had been chasing. Daniels, in court, identified defendant as the suspect he saw in the car and as the robber he chased. He also testified that he had lost sight of the robber for only three to four seconds when the robber ducked near the yellow car.

Robert Kiefer said that he also chased a man, with a basket, from just outside Kresge's after he heard a commotion in the front of the store. Kiefer's testimony was similar to Daniels' regarding the chasing, ducking, and pointing of the gun in the parking lot. He described the fleeing suspect as wearing a brown shirt and blue and white baseball cap, carrying a revolver and sporting a goatee. He noticed that, after the chase resumed from the yellow car, the man was dressed in a white T-shirt and without the blue and white cap. Kiefer continued the chase, unlike Daniels, after the policeman began pursuit. He testified that once the policeman had stopped the man, Kiefer noticed the man no longer had a gun or the basket. Once the man was frisked, Kiefer identified him as the robber he had been chasing. At trial, Kiefer identified defendant as that man. Both Daniels and Kiefer testified that the chase

lasted only minutes; that defendant was the only person, besides themselves, they saw running; and that defendant was out of sight for only three to four seconds during the chase.

Officer Paul Tadelski, who identified defendant in court as the man he had pursued and stopped, said that defendant had passed in front of his squad car, had told him to stop two men from chasing him and had then run off. At almost the same time, Tadelski said he heard a radio dispatch about the Kresge robbery and so he pursued defendant. Defendant, he testified, ran to a slowly moving car which suddenly pulled away after defendant opened the passenger door. Tadelski phoned in the license number of the car and then chased after defendant, who finally stopped, began to aimlessly walk around, and asked why he was being chased. Another officer made the actual arrest. Tadelski said defendant did not have the gun or the basket when stopped but that later he saw both items in the custody of the police. The gun, a .25-caliber Browning automatic, was identified as belonging to defendant. Other testimony for the State corroborated the above testimony.

Officer Mark Delise testified that he and another officer, after two young males called it to their attention, found a gray shopping basket with some money in it in between two parked cars. A white canvas bag and more money were lying beside the basket. Delise also stated that while taking pictures he found a can of mace about four feet away. Detective John Logue, who took the money into custody, testified that he counted the recovered money in the presence of a Kresge employee. The amount recovered was $114 less than the amount an audit indicated was taken.

Defendant testified he had gone to the Oak Brook shopping center with five of his children in order to take his daughter, Monica, to the doctor's office. When she was finished, they went to the Kresge store next door, where

the children looked around while he phoned home and picked up a K-Mart application form at the window of the cashier's cage. He was wearing a white T-shirt and striped pants at the time, he said. Afterwards, he looked at terrariums, bought trash bags, left the store with the children and was driving away when they decided to return to Kresge's to buy the terrarium for defendant's wife. Defendant testified that, as he was getting out of the car, he heard shouting and saw two men chasing a third, who was wearing a cap and a brown shirt and who, defendant thought, was a shoplifter. He went to the trunk of the car to fetch his gun, closed the trunk, threw the keys onto the seat and grabbed a can of mace, told the children to stay put, and ran after the suspect. He drew close enough to tell the running man to throw the basket down and to stop. Defendant testified the fleeing suspect complied with the first demand but then ran off toward the Jewel store. Defendant said that he pushed the basket under a car and, as he did so, his can of mace fell. Then he ran into an aisle. He was forced to jump back as a swiftly moving car, with two women inside, drove past. At this point, he was 75 feet from the running man. He then noticed, on the ground, a brown shirt, which he waved to attract the attention of squad cars. Defendant testified he began the chase once more but was stopped by a police car. Protesting, defendant threw his gun down, told the police they stopped the wrong person, and walked around in disbelief.

Testimony by defendant's children supported his version of events and testimony by others indicated defendant did wear a white T-shirt and striped pants that day. There was also testimony that a hair found on the blue and white cap was not defendant's nor were there identifiable fingerprints on the shopping basket.

Defendant testified that he had been a member of the Chicago Police Department since 1955; he was suspended

for not living in the city but expected to be reinstated within three to four weeks. (This was corroborated by other testimony.) Other testimony evidenced he had otherwise been in good standing with the department.

At the trial, defendant was not permitted to testify as to how he had acted on previous occasions in similar situations while off duty, where immediate action was necessitated. He was permitted, however, to explain his actions in this case; to testify to the existence of Chicago Police Department regulations which required policemen to carry their guns 24 hours a day and to take action, even if off duty, when they are witnesses to a crime; and to explain why he was carrying a gun, he said that his life and the lives of his family had been threatened.

Defendant contends that he was denied his right to present a defense because the trial court refused to permit him to explain his actions at the scene of the crime with testimony concerning prior off-duty arrests he had made in similar situations, pursuant to the Chicago Police Department's regulation that an officer is on duty 24 hours a day. He claims that he was so prejudiced by the exclusion of this testimony that a reversal and remand are necessary.

Without question, as the defendant states, an accused has "the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." (*Washington v. Texas* (1967), 388 U.S. 14, 19, 18 L. Ed. 2d 1019, 1023, 87 S. Ct. 1920.) In addition, it is clear that, consistent with the right to present a defense, there is the right of an accused to show, by competent evidence, facts which tend to prove that he did not flee from the scene of the crime from a consciousness of guilt (*People v. Autman* (1946), 393 Ill. 262; *People v. Davis* (1963), 29 Ill. 2d 127). However, the cases cited by defendant in support of the general proposition that an accused has the right to present a defense do not support his contention

that, on the facts of this case, he was denied this right. In *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, for example, strict application of technical rules of evidence denied the defendant his chance to introduce testimony of three witnesses as to separate oral confessions allegedly made to them by a third person shortly after the crime, or to call and confront that third person as an adverse witness. In *Washington v. Texas,* a State statute rendered accomplices incompetent to testify on behalf of the accused, thereby preventing defendant from presenting his version of the facts to the jury. In each case cited, a crucial part of the defendant's case was excluded, so that the accused had an insufficient opportunity to respond to the State's accusations.

Here, however, defendant was not denied an opportunity to present crucial matters explaining his actions. The exclusion of testimony as to defendant's prior off-duty arrests did not prevent him from furnishing an explanation for his apparent flight through the parking lot with a gun in his hand subsequent to the robbery. Rather, defendant was allowed to testify that he was chasing a man he believed to be a shoplifter when he himself was arrested. And he was allowed to assert that he was an 18-year veteran of the Chicago Police Department and that the department's policy is that an officer is on duty 24 hours a day and is expected to take immediate action if he is a witness to a crime. Such testimony sufficiently allowed the jury to infer that the accused was acting pursuant to that policy, at the scene of the crime, even though he was suspended, and that he was doing so with an innocent state of mind.

We believe the defendant's last contention, that his guilt was not established beyond a reasonable doubt, must also fail. We agree with the appellate court that, as difficult as it may be "to believe that a police officer who is suspended for reasons other than dereliction of duty

would take his children with him" (40 Ill. App. 3d 362, 368) while he robbed a store, the trier of fact is not bound to believe testimony of the defendant as against the State in such a case. Where "the evidence is irreconcilably conflicting, it is the peculiar prerogative of the trier of fact *** to ascertain the truth." (*People v. Hammond* (1970), 45 Ill. 2d 269, 278.) A reviewing court may not substitute its judgment for that of the trier of fact "on questions involving the weight of the evidence or the credibility of the witnesses [citations], and we will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of guilt." (*People v. Stringer* (1972), 52 Ill. 2d 564, 568.) Finally, "where the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and he viewed the accused under such circumstances as would permit a positive identification to be made." 52 Ill. 2d 564, 569.

Accordingly, we affirm the judgment of the appellate court.

*Judgment affirmed.*