THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY D. LINDSEY, Defendant-Appellant.

First District (4th Division)  No. 77-855

Opinion filed May 31, 1979.

James J. Doherty, Public Defender, of Chicago (Andrew J. Kleczek, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Francis X. Speh, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a bench trial in the circuit court of Cook County, defendant, Larry D. Lindsey, was found guilty of armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2) and attempt murder (Ill. Rev. Stat. 1977, ch. 38, pars. 8—4, 9—1). He was sentenced to a term of 5 to 10 years for armed robbery and to a term of 3 to 9 years for attempt murder, the sentences to run concurrently.

On appeal, defendant contends: (1) he was not proved guilty beyond a reasonable doubt of either armed robbery or attempt murder; and (2) the trial court erred in denying his motion to suppress the identification testimony.

We affirm the trial court.

Prior to the start of trial, defendant filed a motion to suppress the identification testimony. By agreement of the State and the defense, the suppression motion was held in abeyance until conclusion of the trial.

Daniel Frederickson testified that in September 1975 he and Steven Battersby lived in an apartment at 33 Rockford Avenue in Forest Park, Illinois. On September 11, 1975, at approximately 12:45 a.m., Frederickson parked his Mercedes automobile in the lot behind the apartment building where he lived and turned the headlights off. The Mercedes was facing the back of the apartment building and Rockford Avenue. He opened the car door activating the automobile's dome light. As he began to exit from the car, a man pushed a gun into his left side and announced: "This is a stick up." Frederickson saw a second man (whom he later identified as the defendant), standing eight to 10 feet behind the gunman.

The gunman then ordered Frederickson to lie down across the front seat of the car. Frederickson could not lie flat because of an arm rest in between the driver and passenger seats. The gunman then asked Frederickson where his wallet was and Frederickson replied that it was in his left rear pocket. The gunman reached in, took the wallet and the keys

from the car's ignition and threw them to defendant. Frederickson saw defendant catch the wallet and the keys.

At this point, Battersby approached Frederickson's car shouting, "Hey, there, what are you doing?" The gunman and defendant retreated to an automobile parked 20-25 feet away on Rockford Avenue. The gunman jumped into the driver's seat of the automobile, while defendant entered the passenger side. Battersby ran "right up" to the rear end of the robbers' automobile and yelled, "What are you doing?" The robbers "delayed a few seconds" and then accelerated off. Shortly thereafter, the police arrived on the scene.

"A half hour, perhaps 45 minutes later," Frederickson was driven to the vicinity of Roosevelt and Kostner in the city of Chicago, where he identified the defendant, who was then in police custody, as one of the men who had robbed him. Frederickson also identified defendant in court.

Frederickson stated further that the parking lot of his apartment building was well lit at the time of the robbery. There was a street light about 20 feet from where his automobile was parked that night, a flood light on the back of the apartment building near the rear entrance; and the dome light in his automobile was on throughout the incident.

On cross-examination, Frederickson testified that as he was lying in a "pushed over position" across the front seat of his Mercedes, his eyes were level with the dashboard, the armrest was sticking in his ribs, and he could turn his head freely. Defendant was standing approximately 17 feet behind the gunman, and was wearing a cap, a print shirt and a checkered coat with different colors. Frederickson could not tell the color of defendant's pants and could not remember if defendant had any facial hair.

After furnishing the police with a description of both offenders at the Forest Park police station, Frederickson was transported with Battersby to Arthington and Kilpatrick in Chicago. Frederickson identified the automobile depicted in People's exhibits Nos. 1 and 2 as the same automobile the robbers used and which he later saw abandoned in the vicinity of Arthington and Kilpatrick.

Frederickson and Battersby were then driven to the intersection of Roosevelt and Kostner. Defense counsel asked Frederickson what he saw when he arrived at that location.

"A. Well, I saw several squad cars from different police departments. I saw a helicopter with a beacon light. Some canine patrol [sic] and several individuals that had been apprehended.

Q. When you saw [say?] several, how many?

A. Oh, I guess ten at the most."

Defendant and another man were standing together in the midst of officers. Frederickson did not remember defendant being handcuffed.

The Chicago police officers asked Frederickson to walk up and

examine the various suspects. Frederickson complied and immediately identified defendant as one of the robbers. At the time of this identification, Battersby was separated from Frederickson.

The State called Steven Battersby as its next witness. Battersby testified that in September 1975 he and Frederickson lived in an apartment at 33 Rockford Avenue, Forest Park. After finishing work, Battersby arrived home on September 11, 1975, at approximately 12:30 a.m.

Battersby was standing at the kitchen sink cleaning his thermos when he heard "scuffles and voices" coming from the parking lot. Battersby parted the curtains on the kitchen window and looked out. He saw: (1) Frederickson lying across the front seat of his Mercedes; (2) a second man leaning inside the car's open door; and (3) a third man, later identified as the defendant, standing a foot or two behind the second man. Battersby was able to see defendant's face and he described defendant's clothing that night as a multicolored shirt, a brown jacket and brown pants.

Battersby testified that several sources of light illuminated the area around Frederickson's automobile at the time of the robbery. There were street lights 50 to 60 feet away at the intersection of Rockford and Brown, a lamppost in the nearby alley, and "lights on the side of the [apartment] building." The dome light in Frederickson's Mercedes was also on during the incident.

Battersby stated that he grabbed the kitchen telephone, threw it to his girlfriend and told her to call the police. He then ran out the front door of the apartment building, turned left and ran around to the parking lot in back. As he reached the lot, Battersby related that he noticed the two robbers entering an automobile parked nearby on Rockford Avenue. Battersby described the automobile as a 1974 or 1975 Buick with a light blue body and a white vinyl roof, bearing license plate number VS-5981.

As Battersby ran up and got to within three to five feet of the rear of the robbers' automobile, he shouted: "Stop, halt, hold it." The two robbers turned and looked over their shoulders. Battersby could clearly see defendant's face. The robbers then accelerated down Rockford, turned right at an intersection located 40 feet away, and headed east on Brown. When the robbers made this right hand turn onto Brown, Battersby, who had pursued the automobile on foot, stated he was able to again see the defendant's face through the passenger side window. Defendant was looking straight at him. Battersby identified defendant in court as the robber.

Battersby asserted that when he lost sight of the robbers' automobile, he ran back to the apartment, grabbed the phone from his girlfriend and talked to the police. He gave them a description of the suspect automobile including its license plate number. He also described the robbers as two

male Negroes, between 5 feet 6 inches and 5 feet 10 inches in height and approximately 20 to 25 years old. Battersby informed the police that defendant was wearing a multicolored shirt, a brown jacket and brown pants.

The police told Battersby that a squad car was on the way. Battersby and Frederickson waited in front of the apartment building. About 10 seconds had elapsed when Officer Joseph Madden of the Forest Park Police Department arrived on the scene. Battersby began to repeat his description of the two robbers to Officer Madden when a radio dispatch announced that a high-speed chase was in progress. Officer Madden told Battersby and Frederickson that he had to join the chase and that they should go back into their apartment and call the station.

The police subsequently asked Battersby and Frederickson to come to the station, which they did. After talking to detective Michael Thompson, they were driven to the intersection of Roosevelt and Kostner in Chicago. There were several Chicago police cars parked on the street and a group of policemen standing around. Battersby noticed two men standing alongside a squad car and immediately identified them as the robbers. Defendant was one of those two men. His clothing matched the description Battersby had earlier furnished to the Forest Park police. Battersby testified that defendant and the other man were the only two suspects he saw in police custody, and they were handcuffed together.

Battersby and Frederickson were then driven to Arthington and Kilpatrick where they identified an abandoned automobile as the one the robbers had used. Battersby identified People's exhibits Nos. 1 and 2 as depicting this same automobile.

On cross-examination, Battersby contended that he looked out his kitchen window at the two robbers for approximately 15 to 20 seconds. At an earlier preliminary hearing, Battersby had stated that he looked out the window for about 10 seconds. Battersby could not recall if at the time of the robbery defendant had a hat on, had straight or "natural style" hair, or had a beard or moustache. Battersby denied telling Officer Madden that he did not see the second robber very well.

The State called as its next witness Oak Park Police Sergeant Joseph Mendrick. Sergeant Mendrick testified that on September 11, 1975, at approximately 1 a.m., he received a radio dispatch of an armed robbery in Forest Park. He was given a general description of the robbers' automobile including its license plate number.

As Sergeant Mendrick approached the intersection of Jackson and Harlem, he saw an automobile, containing two occupants, which matched the description furnished by the Forest Park police. The automobile was traveling south on Harlem at approximately 45 to 50 miles an hour.

Sergeant Mendrick pursued the vehicle onto the Eisenhower Expressway, where it weaved in and out of traffic and eventually accelerated to over 80 miles an hour.

The suspect automobile exited at Austin Boulevard, crossed Austin, and reentered the Eisenhower Expressway. Sergeant Mendrick stated that somewhere between the expressway exits for Austin Boulevard and Cicero Avenue, "an arm came out of the passenger window of the automobile holding a gun and * * * fired." Sergeant Mendrick was 100 feet behind the vehicle at this time and in the same lane of traffic.

The suspect automobile exited the expressway at Cicero Avenue and headed south. Sergeant Mendrick continued in pursuit of the automobile, when suddenly he saw its brake lights flash. As Mendrick pulled to within eight car lengths of the automobile, "the passenger * * * on the right side c[a]me halfway out of the window, face[d] my squad car and start[ed] firing a gun." Neither Mendrick nor his squad car was hit.

"Q. What if anything did * * * [you] do after he fired twice at you?

A. I slammed on the brakes, * * * put [my squad] car into park, * * * opened the door and rolled out * * *.

＊ ＊ ＊

When I came up, the vehicle * * * was accelerating."

Sergeant Mendrick fired three shots at the automobile before it turned right onto Arthington Street. As Mendrick jumped into his squad car to continue in pursuit, he heard a large crash. Mendrick found the suspect automobile on Arthington up against a tree with both doors open and the occupants gone. The automobile's front passenger side window was shattered, two of the tires were flat and there was a bullet hole in the roof.

The State called Chicago Police Officer Richard Urittky as its next witness. Officer Urittky testified that in response to a radio dispatch he proceeded to the intersection of Arthington and Kilpatrick where he found an automobile up on the curb. A supervisor informed Urittky of the Forest Park armed robbery and subsequent chase and then ordered Urittky and his partner to search the nearby railroad embankments for the two robbers.

During this search, Officer Urittky received a dispatch that the "two men fitting [the robbers] description boarded a bus on Roosevelt Road [heading] eastbound." Urittky and his partner drove to Roosevelt Road and saw one bus in the general area. They boarded the bus and placed defendant and a second man under arrest. Officer Urittky handcuffed the defendant and the second man together and led them to a squad car. These two men were later identified as the robbers. Officer Urittky could not remember if, at the time of the arrest, defendant had straight or "natural style" hair, or if he had a beard.

After the State rested its case in chief, the defense called Officer

Joseph Madden to the stand. Officer Madden testified that when he arrived at 33 Rockford Avenue in Forest Park, he talked to Frederickson and Battersby for approximately 60 seconds. The only description of the robbers given to him at that time was that of the gunman. Madden did not ask for a description of the second robber because a radio dispatch cut short the conversation.

Officer Madden testified further that Frederickson and Battersby had never told him that they did not see the second robber very well. He admitted, however, that his police report contained the following statement: "[T]he victim and the witness did not see * * * subject number two very well." Officer Madden explained, on cross-examination, that this statement was attributable to his own personal "opinion and assumption."

The parties stipulated that a Chicago police evidence technician dusted the suspect automobile and found two fingerprints on the passenger side door, only one of which was suitable for comparison. The technician could not recall whether the two prints were taken from the inside or outside part of the door. The print used for comparison did not match the fingerprints of defendant.

The defense called as its next witness, Sherman Edwards. Edwards testified that on the night of September 10, 1975, he met the defendant and defendant's cousin, Nathan Hudson, about 7 or 8 p.m. in front of a liquor store on Cicero Avenue. After buying some alcoholic beverages, they walked to Laverne and Ferdinand where they stood on the corner and talked for two to three hours. At about 10:45 p.m., the three of them walked to Hudson's home, which was nearby, and sat on the porch talking with Hudson's mother.

Shortly after midnight, Edwards left and walked to his home, a block and a half away, to obtain bus fare for the defendant. Edwards returned at about 12:25 a.m. After the three of them talked a little while longer, defendant left for the bus stop at Cicero and Hubbard.

The defense called Isaac Price as its next witness. Price was employed as a Chicago Transit Authority bus driver. On September 11, 1975, at approximately 1 a.m., Price was driving a bus east on Roosevelt Road. Defendant and two other passengers boarded the bus at Roosevelt and Cicero using transfers to pay their fares. Although Price recalled all three transfers had been punched at 1:15 a.m., he could not recall what route the transfers were from.

As they boarded the bus, Price overheard the passengers talking about the fact that they had been searched by the police "at Cicero." Price continued on his route and was later pulled over by the police at Roosevelt and Kilbourne. The police boarded the bus and took two of the passengers into custody. Price resumed his route four minutes later.

Defendant testified that on September 10, 1975, at approximately

1 p.m., he met his cousin, Nathan Hudson, at 500 West Oak. Later that same day, defendant and Hudson boarded a bus and rode to Chicago and Cicero where, at about 8 p.m., they met Sherman Edwards in front of a tavern. Defendant substantially corroborated Edwards' previous testimony on what transpired between 8 p.m. and 12:30 a.m.

At approximately 12:50 a.m., defendant boarded a Cicero bus heading towards his home. Defendant got off the bus, with two or three other passengers, at the corner of Cicero and Roosevelt. While defendant and two other men waited for an eastbound Roosevelt Road bus, two plain-clothed Chicago police officers arrived and searched them. Shortly after the officers left, the three men boarded an eastbound Roosevelt Road bus. The bus traveled only a short distance when it was pulled over by the police. Defendant and another man were taken off the bus and handcuffed together.

Defendant testified that the police took a transfer from him and "balled it up." He also testified that, at the time of his arrest, he had a beard and was wearing "buck shoes," pink pants, a brown shirt and a big hat. When he was taken to the Forest Park police station, defendant asserted that his clothes were searched. Defendant stated that no glass was found on his clothing.

Defendant stated further that he was riding the Roosevelt Road bus to get to his home at 1326 South Washtenaw, where he lived with his mother and other relatives. When asked why he had held on to his transfer since the Roosevelt Road bus stopped a half block from his house, defendant testified that if his family was not home, he "would have to go to [his] Auntie's house."

After the defense rested its case in chief, the trial court considered and rejected defendant's motion to quash the arrest and to suppress the identification testimony. The trial court found there was probable cause to arrest the defendant and that an emergency situation existed justifying the show up that had been conducted by the police.

The State called Marsha Smith to testify in rebuttal. Ms. Smith stated that in September 1975 she lived in an apartment at 3737 North Pine Grove Avenue, Chicago, Illinois. On September 10, 1975, at approximately 11:30 p.m., Ms. Smith was driving down the alley behind her apartment building heading for the parking lot. As she entered the lot, she saw an automobile, with two male occupants, pull out of a parking space directly in front of her. She identified the vehicle as the one depicted in People's exhibits Nos. 1 and 2.

Ms. Smith had parked and alighted from her automobile when she was confronted by the two men she had previously seen in the other car. Both of the men were holding guns. Ms. Smith stood "face to face" with one of the men for approximately two to three minutes. She identified the defendant in court as this man. At the time of this confrontation, the entire

parking lot was lighted by four floodlights on the back wall of the apartment building. One of these four floodlights shined directly on the area where Ms. Smith and the defendant were standing.

Following this confrontation, the defendant and the other man entered their automobile and pulled away. After noting the car's license plate number, Ms. Smith ran to her apartment and immediately wrote it down before calling police.

On cross-examination, Ms. Smith testified that when she called the police she gave them the license number and in describing the car "labeled it as a Pontiac."

"Q. Did you tell [the police officer the license number] was DS-5891?

A. That is what was on the report.

Q. Well, did you tell him that?

A. I had another number.

＊　＊　＊

Q. What number did you tell Officer Lynch?

A. I don't remember now.

Q. But it could have been DS-5891, isn't that correct?

A. It could have been."

Ms. Smith testified that the man who confronted her "face to face" was 5'7" or shorter. She was not sure if he had a beard, straight or "natural style" hair, or if he was wearing a jacket. She also could not recall the color of his shirt or pants.

The parties stipulated that Chicago Police Officer Lynch would testify that on September 10, 1975, he arrived at Ms. Smith's apartment and had a conversation with her concerning the above incident. She described the suspect vehicle to him as a two-door, blue pontiac, bearing license plate number DS-5891.

In surrebuttal, defendant testified, that he was 5'9½" tall, and that he had a beard on September 11, 1975.

Following closing arguments, the trial court found defendant guilty of armed robbery and attempt murder. The trial court sentenced defendant to a term of 5 to 10 years for armed robbery and to a term of 3 to 9 years for attempt murder, the sentences to run concurrently.

Defendant appeals.

OPINION

I

Defendant initially contends he was not proved guilty of armed robbery beyond a reasonable doubt. We disagree.

■■ A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility

of the witnesses (*People v. Fleming* (1971), 50 Ill. 2d 141, 277 N.E.2d 872), and we will not reverse a conviction unless the evidence is so improbable as to raise a reasonable doubt of defendant's guilt (*People v. Lofton* (1977), 69 Ill. 2d 67, 370 N.E.2d 517). "[W]here the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and he viewed the accused under such circumstances as would permit a positive identification to be made." *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320, quoting *People v. Stringer* (1972), 52 Ill. 2d 564, 569, 289 N.E.2d 631, 634.

Frederickson, the victim in this case, viewed the defendant for two to three minutes, at a distance of eight to 20 feet, in a parking lot illuminated with several sources of light. His degree of attention was understandably high. The showup at the scene of the arrest was conducted only 45 minutes after the robbery had taken place. Frederickson positively identified the defendant at the showup and in court.

Battersby initially viewed the defendant for 10 to 20 seconds from a distance of approximately 15 feet. When Battersby ran up to the robbers' automobile, he was able to clearly see defendant's face for five more seconds at a distance of three to five feet. There was testimony that Battersby's preliminary description of the second robber accurately fit the defendant's description when he was arrested. Battersby positively identified the defendant at the scene of the arrest and in court.

In summary, we find both identifications of the defendant clear and positive. Defendant attempts to attack the identifications by pointing out that Frederickson's and Battersby's preliminary description of the second robber was vague in that they could only describe the second robber's gender, race and common mode of apparel. An identification, however, is usually not made by distinguishing separate physical features but by the total impression made upon the witness. (*People v. Smith* (1977), 52 Ill. App. 3d 583, 367 N.E.2d 756, *cert. denied* (1978), 436 U.S. 961, 57 L. Ed. 2d 1127, 98 S. Ct. 3079; *People v. Ervine* (1965), 64 Ill. App. 2d 82, 212 N.E.2d 346.) Thus, omissions in preliminary descriptions, where the witness had an adequate opportunity to observe the offender, do not necessarily affect the credibility of the witness' identification nor do they raise a reasonable doubt of the defendant's guilt. *People v. McCall* (1963), 29 Ill. 2d 292, 194 N.E.2d 222; *People v. Tunstall* (1959), 17 Ill. 2d 160, 161 N.E.2d 300; *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 378 N.E.2d 1318.

■■ Defendant claims he had a beard the night of the robbery and yet neither Frederickson nor Battersby could recall if the second robber had any facial hair. There is some question concerning the existence of the beard since both the arresting police officer and Ms. Smith were also

unable to recall the defendant having any facial hair. Nevertheless, assuming, *arguendo*, that defendant did have a beard the night of the robbery, this omission in both the victim's and the witness' preliminary description does not raise a reasonable doubt of defendant's guilt. As we recently stated in *People v. Mendoza* (1978), 62 Ill. App. 3d 609, 616-17, 378 N.E.2d 1318, 1324-25:

> "[I]t has consistently been held that any discrepancies or inaccuracies or omissions as to facial hair * * * are not fatal, but simply go to the weight of the identification testimony and are to be evaluated by the trier of fact. [Citations.]" Accord, *People v. Agosto* (1979), 70 Ill. App. 3d 851, 388 N.E.2d 1018.

Aside from the two positive identifications, Ms. Smith's testimony also cast doubt on defendant's alibi defense. While Ms. Smith's testimony did contain apparent discrepancies, the weight to be accorded her overall testimony was to be determined by the trier of fact.

■■ We find that the totality of the evidence establishes defendant's guilt beyond any reasonable doubt and we will not reverse his conviction for armed robbery.

## II

Defendant next contends that his conviction for attempt murder must be reversed because the evidence does not indicate he shot *at* the police officer. We disagree.

The essence of the crime of attempt murder is a specific intent to kill. (*People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888.) This intent can be inferred from the character of the assault as well as from the use of a deadly weapon. (*People v. Koshiol* (1970), 45 Ill. 2d 573, 262 N.E.2d 446, *cert. denied* (1971), 401 U.S. 978, 28 L. Ed. 2d 329, 91 S. Ct. 1209; *People v. Coolidge* (1963), 26 Ill. 2d 533, 187 N.E.2d 694.) It is generally held that whether the accused had a specific intent to kill raises a question of fact for the trier of fact. *People v. Aliwoli* (1976), 42 Ill. App. 3d 1014, 356 N.E.2d 891.

On direct examination, Sergeant Mendrick testified that as he pulled to within eight car lengths of the suspect automobile, "the passenger * * * on the right side c[a]me halfway out of the window, face[d] my squad car and start[ed] firing a gun." Sergeant Mendrick was questioned further:

> "Q. What if anything did * * * [you] do after he fired *at you*?
> A. I slammed on the brakes, * * * put the [squad] car into park, * * * opened the door and rolled out * * *.
>
>    * * *
>
> When I came up, the [suspect] vehicle * * * was accelerating." (Emphasis added.)

Defendant argues that there was no testimony by Sergeant Mendrick that the gun was fired toward him. While we believe this fact is implicit in the foregoing testimony, we also note that defendant overlooked the ensuing cross-examination of Sergeant Mendrick:

"Q. * * * I believe you stated you saw a hand come out with a gun in it *and the gun was firing at you, is that correct?*

A. Yes sir." (Emphasis added.)

■ There was sufficient probative evidence from which the trier of fact could properly conclude, beyond a reasonable doubt, that defendant shot at Sergeant Mendrick with a specific intent to kill.

■ Defendant argues, for the first time in his reply brief, that the evidence was insufficient to identify him as the man firing the gun. By not raising this issue in his main brief, defendant has waived the contention. Ill. Rev. Stat. 1977, ch. 110A, par. 341(e)(7).

### III

Defendant next contends the trial court erred in denying his motion to suppress both the out-of-court and in-court identification testimony. Defendant reasons that the pretrial identification procedure conducted by the police deprived him of due process. We disagree.

■ A pretrial identification procedure will not be found to have violated a defendant's right to due process unless: (1) the identification procedure was (a) suggestive (*Foster v. California* (1969), 394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127) and (b) unnecessary (*Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967); and (2) it gave rise to a very substantial likelihood of irreparable misidentification (*Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243).

In view of the conflicting testimony concerning the type of pretrial confrontation utilized in this case, it is debatable whether defendant has met his burden of proving that the identification procedure was suggestive (see *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152). Nevertheless, we refrain from reaching that question. Rather, we accept as correct, for purposes of this appeal, defendant's contention that he and another man, while handcuffed together, were the only two suspects exhibited to Frederickson and Battersby at the scene of the arrest. We also recognize the suggestiveness inherent in any showup identification procedure. *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967; *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152.

■ Nevertheless, we find that the showup conducted in this case was justified by exigent circumstances. Immediately following the armed robbery, Frederickson and Battersby furnished the Forest Park police with a description of the robbers and the automobile they were driving.

A few minutes later, an automobile matching that description was spotted by the police and a high speed chase ensued. Shortly thereafter, defendant and another man were taken into custody. Frederickson and Battersby were then driven to the scene of the arrest where the identification of defendant took place. This identification procedure occurred 45 minutes after the armed robbery.

The Illinois Supreme Court has consistently upheld prompt showup identifications of a suspect both: (1) at the scene of the crime (*People v. Bey* (1972), 51 Ill. 2d 262, 281 N.E.2d 638; *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313); and (2) at the scene of the arrest (*People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195; *People v. Newell* (1971), 48 Ill. 2d 382, 268 N.E.2d 17; see also *People v. Heath* (1976), 35 Ill. App. 3d 880, 342 N.E.2d 452). As the supreme court stated in *People v. McKinley* (1977), 69 Ill. 2d 145, 153, 370 N.E.2d 1040, 1043, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1623:

> "[The police officers] might have been derelict in their duties if they did not confront the witness with the suspect. Th[is] procedure tends to insure accuracy, not bring about misidentifications. It 'fosters the desirable objectives of fresh, accurate identifications which may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing offender while the trail is fresh.' [Citation.]"

■■ Aside from the justification for this confrontation, the out-of-court and in-court identification testimony was properly admitted since it possesses sufficient aspects of reliability in view of the totality of the circumstances. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243; *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) Considering the opportunity of the witness and the victim to view the defendant, their degree of attention, the accuracy of their preliminary description, their level of certainty, and the time between the crime and the confrontation, we cannot say that there was a very substantial likelihood of irreparable misidentification. Short of that point, the identification testimony was for the trier of fact to weigh. *Manson v. Brathwaite* (1977), 432 U.S. 98, 116, 53 L. Ed. 2d 140, 155, 97 S. Ct. 2243, 2254.

Accordingly, for the reasons stated, we affirm the convictions and sentences of the defendant.

Affirmed.

JOHNSON and ROMITI, JJ., concur.