THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTURO CHACON, Defendant-Appellant.

Second District   No. 2—82—0480

Opinion filed July 12, 1984.

Edward F. Diedrich, of De Kalb, and G. Joseph Weller, John J. Barrett, and Kyle Wesendorf, all of State Appellate Defender's Office, of Elgin, for appellant.

Eugene Stockton, State's Attorney, of Dixon, and Michael Simkin, of Highland Park (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel) for the People.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, Arturo Chacon, was found guilty in a jury trial of theft exceeding $150 (Ill. Rev. Stat. 1979, ch. 38, par. 16—1(a)(1)) and was sentenced to a 30-month term of probation which included, as conditions thereof, restitution of $39,855.06 and 12 months of periodic imprisonment in the Lee County jail.

Two issues are presented for our review: (1) whether defendant was proved guilty beyond a reasonable doubt; and (2) whether the order of restitution in the amount of $39,855.06 should be vacated as not supported by the proofs and entered without a presentencing hearing or a finding of defendant's ability to pay restitution.

This case involves the alleged theft of funds exceeding $150 belonging to St. Mary's Home and School Association Bingo Fund during defendant's tenure as chairman from July 1, 1977, until July 1, 1980. We set forth the relevant facts.

Robert J. Brophy served as chairman of the St. Mary's Home and School Association bingo operation for one year immediately prior to

defendant becoming chairman. He turned over to defendant on July 1, 1977, a checking account with a balance of $2,345.38, and a savings account with a balance of $6,621.39. These precise amounts were told to him by the State's Attorney. He also turned over a ledger in which he recorded the weekly bingo receipts, disbursements, and revenue taxes owed. Henry Cordell succeeded defendant as chairman on July 1, 1980. He received from defendant $300 starting cash in the latter part of June, and on July 4 received $105 in checks and another $27 in cash. The checking account had a balance of $67.35 and there were no other accounts. He also received a ledger book and the checkbook used by defendant, although the checkbook did not have dates for some of the checks nor to whom the checks were payable. Several witnesses testified they worked in the kitchen of the K.C. Hall where the bingo games were conducted during defendant's chairmanship, and periodically turned over money to him earned from the sale of food.

David J. Dempsey served as president of the St. Mary's School Board during defendant's chairmanship of the bingo operation and served one year as president of the Home and School Association from 1979 to 1980. The purpose of the bingo operation was to raise funds for St. Mary's School. The chairman handled all the bingo funds and periodically turned monies over to the parish priest. Defendant was to make quarterly reports to the School Board and Home and School Association, but it was very hard to get any report or accounting from defendant. It was also hard finding a volunteer who would be bingo chairman, although defendant at the end of his term wanted to serve one more year and guaranteed $18,000 profit, when prior years' profits were about $12,000 per year.

Tracy Palermini, an officer of the City Bank and Trust Company of Dixon, identified certain checking account and savings account records at the bank in the name of the St. Mary's Home and School Bingo Fund and other accounts of the association. She also examined the bank records for the three-year period defendant was chairman of the bingo operation to determine if there were any certified checks, cashier's checks, bank money orders and personal money orders drawn on any of these accounts, particularly any such document payable to the Illinois Department of Revenue. She found none. Rolfe Ehrmann, the attorney for St. Patrick's parish, in which St. Mary's School was located, was consulted by Henry Cordell after he took over chairmanship from defendant. He went through defendant's books and records to determine if taxes were paid and they showed taxes were paid. However, he determined that taxes totalling $9,200

were not paid and that the bingo license fee had not been paid from April 1, 1978, to March 31, 1980. He told the parish priest to turn over the records to the police.

Father Gerald Kobbeman, as the pastor of St. Patrick's parish, oversees all the activities of the parish, including the bingo operation of the St. Mary's Home and School Association. Upon receiving notice that the State taxes were not paid for the bingo operation and the bingo license was not current, he talked with the defendant. Defendant first said the taxes were paid by a money order from the City National Bank. He talked with City National Bank personnel and explained what the bank told him. Defendant then said the taxes were paid by cashier's check. Father Kobbeman again checked with the bank, and when no cashier's check was found, talked with defendant, who said he did not know why the cashier's check couldn't be found. Father Kobbeman also discussed with defendant several large checks which were payable to cash. Defendant said the checks were to pay bingo winners who did not want a check made to them personally. Subsequently, defendant said he cashed the checks himself and used the money as starting money for the bingo games the next Friday. Defendant also told him the bingo license was at the K.C. Hall and had been paid for. Defendant turned over certain checks to him, although a lot were missing. Defendant said some were destroyed by water damage in his basement. Some monies were supposed to be in certificates of deposit, but defendant could not remember the bank. Each year defendant turned over to Father Kobbeman $10,000, $7,700 and $12,000 respectively for each of the three years of his chairmanship. $12,000 per year was budgeted. A more formal type of bookkeeping has now been instituted, although there were no procedures existing before and during defendant's chairmanship. Father Kobbeman turned over all the records to the police.

Lieutenant Larry Hagan of the Dixon police department investigated the matter. When he questioned the defendant, he was told that defendant alone made all deposits and withdrawals. Defendant said he used proceeds from the games to pay expenses, taxes, and St. Mary's School. Defendant made all the decisions except that Father Kobbeman would tell him when to pay over funds to St. Mary's. Defendant would take receipts from the bingo games and from the periodic kitchen food payments and take them home. He would thereafter place them in his safe or deposit them in City National Bank. Hagan discussed all the checks with defendant, how expenses were paid, and went over the ledgers. Defendant said most disbursements were by check, but some were cash for small amounts. Defendant verified that

the entries in the ledgers were made by him, which included tax computations in the ledgers. Defendant stated he paid the taxes by check or by bank draft quarterly. By Hagan's computations, which were explained to the jury in detail, defendant was short money for each year of operation of the fund and Hagan asked defendant for an explanation. Defendant was surprised by Hagan's computation and said he didn't know where any missing money was.

John Van Osdol, a certified public accountant, conducted an audit of the St. Mary's Home and School Association Bingo Fund for the period of 1977 through 1980. Using the bank statements, cancelled checks, and game report journals (ledgers) he reconstructed what he thought the financial statements would look like. Van Osdol used transparencies to show the actual figures and how they were obtained. He explained that after reviewing the records it was determined that as of July 1, 1977, there should have been a balance of $2,345 in the checking account and $6,621 in the savings account turned over to defendant. The interest earned on certificates of deposit and the savings account over the next three-year period was estimated to be $528. Deposits received from the kitchen fund for three years totalled $9,050. Gross receipts from bingo games listed in the game report journals from July 1977 to June 1980 were $199,486. All these figures totalled $209,064. The disbursement of monies paid to winners, taken from the game report journal, totalled $141,230. There were checks written totalling $52,386 and bank N.S.F. charges of $464. All these disbursements totalled $194,080.

At the end of the three-year period in which the defendant was bingo chairman, Van Osdol estimated there should have been the balance of receipts less disbursements of $23,950 presented to the next chairman. A total of $542 was handed to Mr. Cordell, leaving $23,408 unaccounted for. Van Osdol characterized this examination as a bookkeeping reconstruction taking the records that there were and reconstructing what the records showed. He conducted a further examination, a documentation examination, in which all checks made to cash and all checks to individuals, apparent prize winners, which he felt did not have adequate documentation, were examined. He added checks payable to cash of $4,750, checks payable to individuals of $10,690, a check payable to Maria Chacon for $225, a grocery check for $278, and $400 in debit memos for N.S.F. checks. These figures, added to the $23,408 figure, brought his estimate of the total unaccounted-for difference to $39,751. Van Osdol stated that the actual unaccounted-for difference could range anywhere from $23,000 to $60,000. He based the larger amount of up to $60,000 upon a further analytical re-

view where he used percentages and trends of profit. The audit could not be a certified audit primarily because of the lack of documentation to support the disbursements. There was no control over the bingo payouts during Brophy's, Cordell's, or defendant's tenure as chairman. Van Osdol recommended new procedures for future chairmen of the bingo operation.

For the defendant, Steve Garland, a certified public accountant, testified that he reviewed all the defendant's records, but considered that information not to be a complete set of books. He could not determine from the records available what, if any, cash was collected and was unaccounted for because of a lack of documentation. He concluded that for the three-year period of defendant's chairmanship over the bingo operation that there was an incomplete set of accounting records, resulting in a "weak audit trail" which made it impossible to determine any misappropriation of funds. A true and authentic audit of the records could not be made. He had no quarrel with Van Osdol's calculations based upon the frame of reference Van Osdol started with.

Defendant's wife testified they lived in a house they purchased for $19,000, which had several mortgages. Their lifestyle had not changed in the last eight years. Defendant took the stand, but limited his brief testimony to matters after July 1, 1980. He never had any experience or training as a bookkeeper.

■ Defendant's first contention is that the State failed to prove him guilty of theft beyond a reasonable doubt because there was insufficient evidence that a theft occurred and that defendant, and no one else, took the funds. He further argues that while the evidence reveals gross mismanagement of the bingo fund operations, inadequate accounting procedures, and poor judgment on the part of several individuals connected with the fund, the State failed to prove the unaccounted-for funds resulted from a theft and it was the defendant who took the funds. Defendant relies on *People v. Frig* (1981), 100 Ill. App. 3d 602, 426 N.E.2d 1251, as primary support for this argument. While there is some similarity in our case to some of the facts in *Frig*, we believe the court in *Frig* found insufficient evidence to convict primarily from the defendant's therein lack of exclusive control over and access to a restitution fund over which she had charge. (100 Ill. App. 3d 602, 605-06, 426 N.E.2d 1251.) We therefore do not find that case controlling as, in the instant case, the defendant had sole control over the receipt of the funds, the disbursements, and the record keeping for the three-year period of his chairmanship of the bingo operation.

Defendant was charged with theft by knowingly exerting unauthorized control over the Bingo Fund, intending to deprive the St. Mary's Home and School Association Bingo Fund permanently of the use or benefit of such property. (Ill. Rev. Stat. 1979, ch. 38, par. 16—1(a)(1); see *People v. Alexander* (1982), 93 Ill. 2d 73, 77-78, 442 N.E.2d 887.) The State's proofs showed that during defendant's three-year chairmanship of the bingo operation he had exclusive control over the receipts from the bingo games, he solely maintained the records of receipts in the ledger books, and he made all disbursements and kept what records there were of these disbursements. John Van Osdol, the certified public accountant who testified for the State, using the records prepared and kept by the defendant for the three-year period, concluded that the balance of funds which should have been turned over to the next chairman was $23,950, instead of only the $542 which was given by defendant to his successor. He concluded there was $23,408 unaccounted for from his bookkeeping reconstruction of the defendant's own records. In his testimony, defendant did not give any other explanation of this deficiency, but had expressed surprise when confronted by Lieutenant Hagan upon Hagan's similar conclusion from his own analysis of the records. Defendant's own certified public accountant did not dispute Van Osdol's calculations, but stated that in his professional opinion, because of the incomplete set of accounting records, there was a "weak audit trail" which made it impossible to determine any misappropriation of funds.

Issues as to the relative credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact to determine. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313; *People v. Riggins* (1958), 13 Ill. 2d 134, 139, 148 N.E.2d 450.) Other evidence indicating a consciousness of guilt was presented to the jury. When first confronted concerning payment of taxes to the Illinois Department of Revenue and the bingo license fee, defendant said the taxes were paid and the disbursements showed they were paid. However, the fact was that quarterly tax payments were not made and the license was not current. These unpaid taxes were over $9,000. Defendant also first stated that the taxes were paid by a money order from City National Bank, then later by a cashier's check from the same bank. A witness from the bank testified there was no record of any such transaction. Defendant also told two different versions to Father Kobbeman of whom the checks payable to cash were cashed by, finally stating that some were to him for starting money before the bingo games. Defendant also expressed a strong desire to keep the chairmanship of the bingo operation and promised to make

more money, even though that job was a volunteer position with little help and considerable work.

■ Considering the entire evidence, particularly defendant's exclusive control over both the receipts and disbursements and all the records of the bingo operation, we conclude the evidence shows a substantial, unaccounted-for shortage in the Bingo Fund and sufficient proof that the jury could have properly found defendant guilty of felony theft. See *People v. Thompson* (1979), 75 Ill. App. 3d 901, 905, 394 N.E.2d 422; *People v. Murphy* (1978), 65 Ill. App. 3d 935, 939-41, 382 N.E.2d 1260.

■ Defendant next contends that the portion of his sentence which orders him to pay restitution of $39,855.06 as a condition of his probation must be vacated. One argument he makes is that no presentencing hearing was held pursuant to section 5—5—6(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—6(a)) to assess the financial capacity of the defendant and to determine the amount and conditions of payment. Any right to such a hearing is waived by defendant's failure to demand one below. (*People v. Eades* (1984), 123 Ill. App. 3d 113, 118-19, 462 N.E.2d 819; *People v. Gibson* (1982), 106 Ill. App. 3d 912, 913, 436 N.E.2d 732; *People v. House* (1981), 98 Ill. App. 3d 304, 308-09, 424 N.E.2d 412.) Moreover, at both the sentencing hearing and the trial itself the amount of the alleged theft was thoroughly addressed by the State and the defendant, and any separate hearing would be duplicative. See *People v. Johnson* (1982), 106 Ill. App. 3d 171, 172, 440 N.E.2d 1257.

■ Another argument advanced by defendant on appeal is that the trial court failed to make a "finding" of his ability to pay restitution. Defendant cites section 5—5—6(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—6(a)) as authority which he argues requires a "finding" by the court of the financial capacity of the defendant to make restitution. Section 5—5—6 is a general restitution provision applicable where, together with some other authorized disposition, restitution to the victim is ordered. (See Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.) This general restitution provision does provide that a hearing be held to assess the financial capacity of the defendant to make restitution, and there is some authority that the trial court must state that it has considered the factual basis upon which it has concluded that the defendant has the financial capacity to make restitution even if a hearing is waived. (See *People v. Johnson* (1982), 106 Ill. App. 3d 171, 173, 440 N.E.2d 1257.) Here, however, restitution was ordered as a condition of probation pursuant to section 5—6—3(b)(9) (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—

3(b)(9)), which specifically provides for restitution when ordered as a condition of probation. This statutory provision does not require any "finding," or even any inquiry, by the court of defendant's financial capacity to make restitution. Other appellate decisions hold that section 5—6—3(b)(9) does not condition restitution on a defendant's ability to pay, but the amount ordered must be "reasonable and just." *People v. Knowles* (1980), 92 Ill. App. 3d 537, 540, 414 N.E.2d 1322; *People v. Tidwell* (1975), 33 Ill. App. 3d 232, 238, 338 N.E.2d 113.

Despite this apparent difference in sections 5—6—3(b)(9) and 5—5—6(a), we conclude the record here adequately supports an order for defendant to make restitution under either section. (But see *People v. Johnson* (1982), 106 Ill. App. 3d 171, 173, 440 N.E.2d 1257, where the court held a factual basis upon which the trial court has concluded defendant has the financial capacity to pay must be stated under section 5—5—6(a); however, see Barry, J., dissenting in *People v. Morrison* (1983), 114 Ill. App. 3d 828, 833-34, 449 N.E.2d 859, where *People v. Johnson* is distinguished.) Defendant had been steadily employed earning $11.38 per hour, sometimes worked at two jobs, was placed on probation, which gives him the opportunity to earn income to pay restitution, and was rehired by his former employer. Additionally, considering that the purpose of restitution is to compensate for the loss to the victim of the crime caused by the conduct of the defendant, we do not believe the capacity of a defendant to make restitution at the time of sentencing must necessarily be then determined. We observe that the statute provides that the court may later impose up to an additional two-year period after probation expires to make restitution if the conditions of payment have not been satisfied. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—3(b)(9); see also Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—6(d).) Furthermore, probation shall not be revoked for failure to comply with a condition of probation which imposes a financial obligation upon the offender unless such failure is due to his wilful refusal to pay. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—6—4(d).) On this record, we find no error in the trial court's order that as a condition of probation defendant make restitution of the funds he stole, even though the amount is large.

■ However, we conclude that there was insufficient proof that $39,855.06 was the actual out-of-pocket loss proximately caused by the conduct of the defendant. Rather, we believe that the provable loss over the three-year period was $23,408, as testified to by John Van Osdol and shown in the State's Exhibit No. 143. Essentially, this computation encompasses Van Osdol's calculation of the beginning balances of the accounts received by defendant on July 1, 1977, the re-

ceipts and disbursements over the three-year period defendant handled the fund, and the actual balance turned over by defendant to his successor on July 1, 1980. Although Van Osdol also testified that in an analytical review based on percentages and trends the unaccounted-for difference would range from $23,408 to approximately $60,000, this method of computation of possible loss over $23,408 is too speculative for purposes of ordering restitution. In addition, the $39,855.06 restitution figure arrived at by the trial court is based upon Van Osdol's computation that disbursements to cash and to apparent individual prize winners totalling approximately $15,000 did not have adequate documentation and therefore were added to the $23,408 loss computation. While from accounting principles these disbursements may be labeled as undocumented because not supported by evidence other than the checks themselves, an order of restitution under the facts here which includes this $15,000 calculation without a showing of actual loss cannot stand. Accordingly, we modify the order of restitution to $23,408.

For the foregoing reasons the judgment of the circuit court of Lee County is affirmed as modified.

Affirmed as modified.

SEIDENFELD, P.J., and UNVERZAGT, J., concur.