THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HOSEA MEADOWS, Defendant-Appellant.

Third District    No. 79-308

Opinion filed March 14, 1980.

Rick Halprin, of Chicago, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Defendant, Hosea Meadows, appeals from the judgment of the Circuit Court of Will County, entered after a bench trial, finding him guilty of murder. He was sentenced to a term of from 30 to 60 years in the penitentiary for the murder of Anne Flaks. The shooting which resulted in fatal injuries to Mrs. Flaks occurred on October 2, 1977. Three issues are raised on this appeal: (1) whether the defendant was proven guilty beyond a reasonable doubt; (2) whether the defendant received ineffective assistance of counsel at trial; and (3) whether the court shifted the burden of proof to the defendant on an alibi defense.

The record discloses that on the night of October 1, 1977, around 10:30 p.m., prosecution witness Larry Milam was in Baity's Tavern, on Washington Street, in Joliet. While he was in the tavern, he noticed a dark green Volvo automobile parked across the street from the tavern which was occupied by a man. The man in the Volvo remained there during the 15-20 minutes that Milam and a friend, Charles Smith, were in the tavern and during the approximately 45 minutes they sat in Smith's car drinking outside the tavern. The two men then left and drove to another tavern, remaining there for an hour or two. They returned to Baity's, parked in front, but remained in the auto to drink beer. While sitting in the auto, they noticed that the Volvo, and its occupant, were still in the same place as when they had left. Smith corroborated this testimony of Milam. Both men then observed a station wagon collide with the parked Volvo, after which it was driven a short distance and then pulled over and stopped. The station wagon referred to was followed by another station wagon, which also pulled over, behind the first, after the accident. Thereupon, the occupant of the Volvo, a black man, wearing dark pants, a dark jacket, and a hat, ran toward the station wagon, fired a shot in the air, and then he proceeded to fire a gun once through the passenger window and then several times through the windshield of the station wagon which had struck the Volvo in which the shooter sat. Both Smith and Milam then saw the assailant run towards the back of the car and then behind the second station wagon, and finally across the street and down an alley. The driver of the second station wagon had got out of his car and run to the first station wagon, and then back to the second station wagon. He then left.

The shots fired by the assailant struck the driver of the first station wagon, Anne Flaks, and she later died from the injuries received in the attack. Neither Milam nor Smith were able to make any identification of the assailant who had fired the shots. However, Richard Lontz, the driver of the second station wagon, testified that he and his wife were following the Flakses on the night in question, because they were concerned that the Flakses had had too much to drink at a party both of the couples had attended. Lontz testified that he stopped behind the Flakses' auto after the accident and then heard a shot. He looked and saw a man running toward the Flakses' auto. The assailant, as he fired the shots into the Flakses' auto, faced Lontz in his auto, which was parked behind the Flakses' auto with its headlights on. Lontz observed the assailant, both as he fired a shot through the side window and as he fired three shots through the windshield. He observed the assailant for a matter of about seven seconds, and noted his striking "half-moon" profile, his eyes and other facial details, and his dark jacket, dark pants, and small hat. Lontz also observed the assailant as he ran back past the Lontz auto.

Lontz then got out of his auto, ran to the Flakses' auto, ascertained that Mrs. Flaks was dead and then turned to go back to his car. As he returned to his car, he saw the assailant again, at the back of the assailant's car, facing him. He saw the gun and the assailant's eyes. Lontz jumped back into his auto as the assailant crossed the street. He drove immediately to the police station. Lontz, at trial, positively identified the defendant, Hosea Meadows, as the man he had seen fire the shots into the Flakses' auto on that night. Lontz' wife also testified, and her testimony was similar to that of her husband, although she was able to view the assailant for a longer period of time, seated as she was on the passenger's side of their car. At trial, she described the man's clothing and his facial features. She observed the assailant, full face, for about four or five seconds while he was shooting into the car in front of hers and again for about four seconds as he moved away from that car and back toward and past her own car. She, too, identified the defendant Meadows at trial as the assailant she had seen on the night of the shooting.

The day following the shooting, being October 3, 1977, Lontz and his wife were both asked to come to the police station to view a photographic lineup. While at the station, they observed the defendant Hosea Meadows several times, in close proximity. Meadows was there, at the police request, after he had notified them that his dark green Volvo had been stolen on the night of October 1. At trial, both Mr. and Mrs. Lontz testified that they recognized Meadows as the assailant at that time and that they were extremely upset and fearful to be in such close, unguarded, proximity to him. Meadows was not in custody at that time and was moving freely about the station. Mr. and Mrs. Lontz entered the

detective's room, individually, and viewed six photographs, including one of the defendant. Mrs. Lontz testified at trial that she was unable to concentrate as a result of seeing the assailant in the hallway. Neither were able to identify the photographs, but Lontz told a detective that the man outside in the hall looked like the assailant. He asked if they could see that man dressed like the assailant. They were told they could not. Lontz testified at trial that he was afraid to identify Meadows on that visit because of the fact that he was sitting, free, just outside.

The detective conducting the photographic lineup testified that the Lontzes appeared frightened and very upset when he talked with them. They did not volunteer any information. He corroborated the Lontzes' testimony that Lontz told him the defendant, in the hallway, looked like the assailant. However, Detective Hulbert thought the Lontzes were unable to positively identify Meadows, and he indicated that they were having trouble communicating because of their agitated states. He did not tell them that the defendant was the owner of the Volvo, nor, he testified, was Meadows' presence planned by the police to coincide with the visit by the Lontzes. Detective Hulbert's testimony was supported by another detective who was at the station on that morning. The other detective added that when he asked Mr. Lontz if he could be positive about his identification of the man in the hallway, Lontz replied, "I have a family at home and I would like to talk to them." He confirmed that both Mr. and Mrs. Lontz appeared upset and frightened. Both Mr. and Mrs. Lontz returned to the police station, in March 1978, at which time they viewed a lineup and identified the defendant as the man who had shot and killed Mrs. Flaks.

Another witness for the prosecution was a barmaid at Baity's Tavern, Rosie Dixon, who was working there the night of October 1, 1977. She testified that she saw the defendant Meadows at the tavern around 10 p.m. and again around 1 a.m. She testified that he was wearing a little cap with a small brim and dark pants and a dark jacket with a beige lining. She testified that she remembered the defendant because of the way his face was shaped and because of his eyes. At around 2:30 a.m. she saw a person in the middle of the street in front of the tavern, wearing clothes like the defendant's. She saw the man cross the street and enter a dark green, foreign-looking auto. She testified that he was carrying a brown bag which was shaped like a bottle. She then witnessed the man jump from the car and run up the street. She was unable to see that person's face. Cross-examination of this witness brought out the fact that she was acquainted with a detective on the police force, since she worked at the police department previously. It was also brought out that her previous statement concerning the clothes worn by Meadows indicated his coat was beige.

The defense, in addition to extensive cross-examination of the prosecution's witnesses, established that the victim, Anne Flaks, on November 25, 1977, had been shown a number of photographs by Detective Hulbert in an attempt to have her identify her assailant. She was in serious condition at the time, suffering from a gunshot wound to the neck, which left her paralyzed on one side, and a wound to her abdomen. She could not identify any of the photographs and when shown the defendant's photo, she stated, "No, that is definitely not him." On cross-examination, it was brought out that the victim, also, stated that she did not get a good look at the man because it was dark and because after one of the shots, she could only look down at her hands, being unable to raise her head. In addition to this evidence, there was testimony from another barmaid at Baity's. The barmaid testified that she remembered seeing the defendant in the tavern that night, but she saw him walk toward the front door about midnight.

The final witness for the defense was the defendant Hosea Meadows. He testified that on the night of October 1, 1977, he drove to Baity's in his green Volvo around 8 p.m., wearing a beige jacket and green pants. He stated that he left Baity's after a couple of hours and drove his car to another tavern, the Turntable Lounge, where he remained for several hours. At the tavern he met two young women, whose first names he remembered, and with whom he danced. Later, in one of the women's cars, they went to another tavern, and he testified he left his Volvo outside of the Turntable Lounge. The trio, according to Meadows, then stopped at a tavern in nearby Lockport and then drove to a Chicago nightspot where they stayed most of the night. After morning breakfast, they returned to Joliet, whereupon the defendant discovered that his car was gone. The women dropped him off a block from his house. He testified that he had never seen the women before that night and that he never saw them again. He called the police and reported the car stolen. He further testified that he did not own a handgun, did not buy wine from Baity's package liquor on the night of October 1, and did not drink in his car on that night. He also denied shooting Anne Flaks. The court, sitting as both judge and jury, found the defendant guilty of murder and sentenced him to a term of from 30 to 60 years.

The first argument by appellate counsel for the defendant is that Meadows' trial counsel was incompetent and that defendant was thereby denied effective assistance of counsel. He argues, specifically, that competent counsel would have filed a motion to suppress the out-of-court identification of the defendant in March 1978. He argues that an even more "fundamental error" was trial counsel's failure to bring forth, during the trial, the fact that Meadows had given substantially the same story to police on the day after the murder as he gave at trial. The gravity of the

latter error, according to appellate counsel, is reflected in the trial court's findings, which, again according to counsel, indicate that the court believed that the defendant's testimony was recently fabricated.

■■ Recently, in *People v. Hills* (1979), 71 Ill. App. 3d 461, 467, 389 N.E.2d 873, we noted the standards required to show incompetence of counsel: " 'In order to establish lack of competent representation at trial, it is necessary to demonstrate "actual incompetence of counsel, as reflected in the manner of carrying out his duties as a trial attorney" which results in substantial prejudice without which the outcome would probably have been different.' [Citation.]" We also noted in that opinion that competency must be determined by examining the totality of trial counsel's conduct, and errors in trial strategy do not establish incompetence. 71 Ill. App. 3d 461, 467.

■■ In the instant case we have reviewed the record and find that the defendant was competently represented at trial. As to the identification evidence that appellate counsel contends should have been objected to by way of motion to suppress, we note that trial counsel cross-examined the Lontzes extensively concerning their failure to positively identify the defendant at the station during the photographic lineup on the day after the shooting. They were also cross-examined concerning their alcohol consumption on the night of the shooting and concerning minor variations in their description given to police on the night of the murder. Defense counsel conducted cross-examination of both detectives and brought forth further evidence, favorable to the defendant, concerning the failure of the Lontzes to positively identify the defendant at the station. Trial counsel used the Lontzes' failures to identify Meadows on October 3, 1977, to his advantage and attempted to undercut both their lineup identification and their trial identification. It may very well have been a strategic decision not to challenge the lineup identification, as that would only further serve to focus attention upon the alleged later change of mind on the part of the witnesses. We also note that appellate counsel does not suggest the basis for challenging the lineup. We also conclude that the suppression of the lineup identification, assuming, *arguendo*, such could have been granted, would not have affected the outcome of the trial, given the Lontzes' identification of the defendant at trial and given the strong circumstantial evidence.

■■ Turning to the asserted "more fundamental" error of trial counsel, his failure to establish that defendant Meadows gave a statement to police a day after the attack which was consistent with his trial testimony, we find the prejudice asserted from this failure is not borne out in the record. Appellant's counsel finds the gravity of the error evident in the court's finding of fact that the defendant's testimony was the product of recent fabrication. If that were the case, then more consideration would have to

be given to this alleged error on the part of trial counsel. However, the record does not indicate that the trial court was under the belief that the defendant's story was of recent fabrication. The court did not so state nor did it imply that, nor did the prosecution suggest it. In its findings, the court did note that Meadows' testimony, in the nature of an alibi defense, was unsupported by other evidence and that it was incredible. The court also noted that there was no testimony that the defendant, nor anyone on his behalf, had attempted to find the two women he alleged were with him on that night. We fail to see in the court's comments any indication that it found the defendant's story was of recent fabrication. We also fail to see how the outcome of the trial would have been any different if the defense counsel would have got into evidence the defendant's prior consistent statement concerning his whereabouts on the night of the killing. In summation on this issue, we believe the record demonstrates competence of trial counsel and no prejudice from either of the omissions asserted to have established incompetence.

■■ The next issue is whether the defendant was proven guilty beyond a reasonable doubt. Appellate defense counsel argues that the court based its findings of guilt on the weakness of the defense proffered at trial and not on the strength of the State's case, thereby impermissibly shifting the burden of proof to the defendant. Given the facts in the record, such argument is without merit. We have noted that a reviewing court will not substitute its judgment for that of the fact finder on conflicting evidence unless the proof is so unsatisfactory as to raise a reasonable doubt of guilt. This is so, obviously, because the fact finder has an opportunity to observe the witnesses and is in a better position to determine credibility and the weight of the evidence. (*People v. Lawson* (1978), 65 Ill. App. 3d 755, 382 N.E.2d 878.) In this case, there was testimony from Mr. and Mrs. Lontz, both of whom witnessed the shooting and saw the assailant for over six seconds, fully illumined by their headlights. They testified as to details of clothing and facial features which fully supported their testimony that they had ample opportunity to see the assailant. They both identified the defendant as the killer, at trial and in a lineup. That they may not have positively identified him the day after the killing at the police station does not, under the circumstances existing at that time, render their subsequent identifications less convincing. Additionally, we note that they testified that they felt they had identified him as the assailant, as noted, at the station. The testimony of one witness is sufficient to convict, even when testimony is contradicted, where the witness is credible and viewed the accused under such circumstances as would permit a positive identification to be made. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313.) Here, two witnesses, with ample

time to view the assailant, identified the defendant as that man. In addition, there was strong circumstantial evidence provided by Milam, Smith and the barmaid Rosie Dixon indicating that the defendant's Volvo, with him in it, had remained outside Baity's Tavern from at least 10:30 p.m. onward. Their testimony is totally inconsistent with Meadows' statement that he drove away from Baity's to another tavern where his car was stolen. We find that the State's evidence before the trial court was fully sufficient, beyond a reasonable doubt, to show that Hosea Meadows committed the murder of Anne Flaks.

As to the court's comments concerning the improbability of the defendant's version of events, we note that where a defendant testifies, he may be judged by the improbability of his story. (*People v. Morehead* (1970), 45 Ill. 2d 326, 259 N.E.2d 796.) The trial court, as a fact finder, was the judge of the defendant's credibility. The court's comments thereon do not indicate any shifting of the burden of proof. Rather, the comments were directed to the unbelievability of that testimony in light of the other evidence. We can see how the court found it incredible that a thief would have stolen the car, returned it to the same parking space where the defendant had parked it earlier in the night, and then sat in the car drinking for an extended period of time. It is also incredible that the car thief would become enraged at someone striking his stolen car, to the extent that he would gun down such person. The defendant's version of the events on that night and the inferences suggested from it were contradicted by the prosecution's strong evidence of guilt.

On the record and for the reasons stated, the judgment of the Circuit Court of Will County is affirmed.

Affirmed.

STENGEL and BARRY, JJ., concur.